# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **WILLIAM D. ARENDALL** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 2:04-0079** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI") benefits, as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's "Motion for Judgment Based Upon the Administrative Record." Docket Entry No. 11. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 19.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment Based Upon the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed his application for Supplemental Security Income ("SSI") benefits on

1

August 26, 1996, alleging that he had been disabled since June 1, 1976, due to disorders of the back and "incarceration for 25 years."[1]  *See, e.g.,* Docket Entry No. 7, Attachment ("TR"), pp. 13; 115-118; 121.  Plaintiff's application was denied both initially (TR 77-78) and upon reconsideration (TR 82-83).  Plaintiff subsequently requested (TR 102) and received (TR 29-76) a hearing.[2]  Plaintiff's first hearing was conducted on April 8, 1999, by Administrative Law Judge ("ALJ"), John P. Garner.  TR 29.  Plaintiff and Vocational Expert, Patsy Bramlett, appeared and testified.  *Id.*  On August 16, 1999, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 10-21.[3]  Specifically, the ALJ made the following findings of fact:

> 1.  The claimant has not engaged in substantial gainful activity since his alleged onset date.
>
> 2.  The medical evidence establishes that the claimant has "severe" impairments consisting of degenerative disc disease of the lumbar spine; chronic hepatitis c; hemorrhoids; dysthymic disorder; psychotic disorder, not otherwise specified; agoraphobia and anti-social personality traits, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P, Regulations No. 4.
>
> 3.  The testimony regarding the severity of the claimant's impairments and resulting functional limitations was not persuasive.

---

[1]Plaintiff's Motion also alleges bilateral carpal tunnel syndrome, hepatitis C, aneurysm, depression, and hemorrhoids as disabling conditions.  Docket Entry No. 12.  The ALJ discussed these impairments in his decision.  TR 730-740.

[2]Plaintiff's hearing was originally scheduled for January 21, 1999 (TR 107-108), but was rescheduled for April 8, 1999 (TR 111).  The record contains two copies of the hearing transcript.  TR 29-76 and TR 768-815.  Plaintiff alleged additional disabling conditions on his hearing request form, which included: "bi-lateral [*sic*] carpal tunnel, Hapatitis [*sic*] C, aneurysm, depression, herinated disks [*sic*], and hemorrhoids."  TR 102.

[3]The ALJ's decision is duplicated at TR 746-757.

2

4.  The claimant retains the residual functional capacity to perform light work with restrictions as described in the body of the decision (as set forth in Exhibits 11E and 13E).

5.  The claimant has no past relevant work experience.

6.  The claimant is a "younger individual, and he has a "high school" education.

7.  Based on an exertional capacity for "light" work, and the claimant's age, education, and work experience, section 404.1569 and Rule 202.20, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled". [*sic*]

8.  Even if the claimant's non-exertional limitations do not allow him to perform the full range of "light" work, using the above cited rule in conjunction with the credible testimony of the vocational expert, warrants a finding that there are a significant number of jobs in the national economy which the claimant could perform.

9.  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.920(f)).

TR 20-21.

On October 20, 1999, Plaintiff timely filed a "Request for Review of Hearing Decision/Order."[4]  TR 8.  On December 18, 2000, the Appeals Council issued a letter allowing 30 days for the receipt of additional evidence.  TR 7.  On August 10, 2001, the Appeals Council issued a letter declining to review the case.  TR 5-6.  Plaintiff subsequently filed suit in the U.S. District Court for the Middle District of Tennessee (Civil Action No. 2:01-0081), and on June 5, 2002, Senior District Court Judge John T. Nixon issued an Order of Remand.  TR 820.  On August 20, 2002, the Appeals Council entered an Order vacating the final decision of the

---

[4]The date on this request was changed to October 20, 1999; "postmark" was handwritten next to the amended date.  TR 8.  There is a duplicate of this form at TR 816.

Case 2:04-cv-00079   Document 20   Filed 02/24/06   Page 3 of 76 PageID #: 3

Commissioner and remanding the case to an Administrative Law Judge for a new hearing.  TR 827.

　　ALJ John P. Garner conducted Plaintiff's second hearing, which commenced on March 21, 2003 (TR 1149-1178), and was continued until April 3, 2003 (TR 1179-1198).  Plaintiff and Vocational Expert, Dr. James D. Flynn, appeared and testified.  TR 1179.  On May 30, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 727-740.  Specifically, the ALJ made the following findings of fact:

1.　　The claimant has never engaged in substantial activity.

2.　　The medical evidence establishes that the claimant has "severe" impairments, including degenerative disk disease, carpal tunnel syndrome, hemorrhoids, a psychotic disorder, depression and opioid dependence, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3.　　The subjective complaints are not credible for the reason discussed above.

4.　　The claimant has the residual functional capacity to perform light work with the psychiatric limitations discussed above.

5.　　The claimant has no past relevant work.

6.　　The claimant was 44 years old at the application date, which is defined as a younger  I [*sic*] individual.  He is currently 51 years of age, or closely approaching advanced age.

7.　　The claimant has a high school education (by GED).

8.　　The claimant does not have any acquired work skills, which are transferable to the skilled or semiskilled work

4

functions of other work . [*sic*]

9.       Based on an exertional capacity for light work and the
         claimant's age, education, and work experience, section
         404.1569 of Regulations No. 4 and section 416.969 of
         Regulations No. 16 and Rules 202.13 and 202.20, Table
         No. 2, of Appendix 2, Subpart P, Regulations No.4 [*sic*]
         would direct a conclusion of "not disabled."

10.      Although the claimant's non-exertional limitations do not
         allow him to perform the full range of light work, using the
         above-cited rules as a framework for decision-making and
         based on the vocational expert's testimony, there are a
         significant number of jobs in the economy which he could
         perform.  Examples and numbers of such jobs are cited
         above.

11.      The claimant was not under a "disability," as defined in the
         Social Security Act, at any time through the date of this
         decision.

TR 739-740.

On July 1, 2003, Plaintiff timely filed a request for review of the hearing decision.[5]  TR

726.  On July 22, 2003, the Appeals Council issued a letter granting Plaintiff 40 days to file a

Statement of Exceptions.  TR 725.  On July 9, 2004, the Appeals Council issued a letter

declining to review the case (TR 722-724), thereby rendering the decision of the ALJ the final

decision of the Commissioner.  This civil action was thereafter timely filed, and the Court has

jurisdiction.  42 U.S.C. § 405(g).  If the Commissioner's findings are supported by substantial

evidence, based upon the record as a whole, then these findings are conclusive.  *Id.*

---

[5]The record does not contain an official request for review form; the only record of this
request is a letter from Plaintiff's counsel.  TR 726.

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to herniated discs, "incarceration for 25 years," bilateral carpal tunnel syndrome, hepatitis C, aneurysm, depression, and hemorrhoids. TR 13, 115-118, and 121. *See also*, Docket Entry No. 12.

### 1. Plaintiff's Medical Records from the Tennessee Department of Correction

On September 16, 1983, Plaintiff's "health history" recorded his "trouble with bowel movements," hemorrhoids, rectal bleeding, constipation, bloody or black stools, rectal pain, and also recorded that Plaintiff's had undergone eleven operations for his hemorrhoids.[6] TR 255-260.

On September 20, 1983, Plaintiff was evaluated using a "Report of Physical Examination." TR 261. Plaintiff's evaluation indicated that he suffered from "chronic hemorrhoids." *Id.* Plaintiff was assessed an "normal adult male except for the hemorrhoids," and referred to the "surgical clinic."[7] *Id.*

Plaintiff's Health Classification Summary ("HCS"), also dated September 20, 1983,

---

[6]This record does not contain a signature or a stamp indicating who conducted the examination or evaluation, nor does it provide a complete record of Plaintiff's complaint, treating physician, tests, diagnoses, or treatment plan. TR 255-260. Many of the records from the Tennessee Department of Correction are similarly incomplete. *See*, TR 209; 217-218; 227-228; 231-232; 235-236; 237; 239; 241-243; 247; 261-262; 266; 270; 273; 276; 284; 285; 289; 294; 320-321; 327; 380-381; 385-386; 390; 393; 401; 403-404; 409-410; 413; 427; 432-440; 444; 455-459; 461-462; 465-468; 472; 475; 479; 483-488; 490; 495; 505-506; and 588.
   Unless otherwise noted, all records from the Tennessee Department of Correction are either unsigned or contain an illegible signature. Also, unless otherwise noted, a lack of discussion of treatment or diagnoses can be attributed to illegible or incomplete records.

[7]The record does not indicate any further treatment, and the signature is illegible. TR 261.

indicated that Plaintiff had no prior psychiatric treatment, and listed a "[t]reatment [r]ecommendation" of "Grade 1 - Minor Attention Required," and a "disability code" for a "Digestive System Disorder."[8]  TR 262.

Plaintiff's "Problem List," also dated September 20, 1983, documented his "major problems" as "chronic recurrent hemorrhoids" and his "temporary problems" as lower back pain ("LBP").[9]  TR 209.

Records dated October 3, 1983 indicate that Plaintiff's hemorrhoids were "under control" and that he manifested "no signs [of] rectal prolapse."  TR 490.[10]  It was recommended that Plaintiff begin a "high fiber diet."  *Id.*  On October 30, 1983, Plaintiff signed a "release from medical responsibility," in which he refused a "high fiber diet."  TR 413.

From March 6, 1984 to March 10, 1984, Plaintiff complained of hemorrhoid pain, was diagnosed with "internal and external hemorrhoids," and was advised to have surgery.  TR 487-488.

On May 18, 1984, Plaintiff complained of a "pulled muscle" in his back, and was given "analgesic balm."  TR 487.

On August 15, 1984, Plaintiff complained of a swollen right knee and asserted that he had "injured [his] knee in [the] past."[11]  TR 487.

From August 31, 1984 to October 6, 1984, Plaintiff complained of back pain resulting

---

[8]This HCS is unsigned.  TR 262.

[9]The record does not indicate any further treatment, or contain a signature.  TR 209.

[10]There is a duplicate of TR 490 at TR 491, and neither copy is signed.

[11]The remaining treatment notes are illegible, as is the signature.  TR 487.

7

from his work activities. TR 486-487. On October 6, 1984, Plaintiff requested a doctor's appointment for treatment of his back pain, and Plaintiff's appointment was scheduled for October 9, 1984. TR 486. Plaintiff also received "analgesic balm." *Id.*

On October 24, 1984, Plaintiff was treated by an "Orthopedic Class I" by Dr. "G. Charles" for his complaint that his left foot "still pains a lot." TR 485.

On October 31, 1984, Plaintiff was treated for "chest pain." TR 485. An x-ray of his chest taken November 1, 1984, revealed "normal" results. *Id.*

On January 2, 1985,[12] Plaintiff sought treatment for pain in his left foot. TR 484. Upon physical examination, Plaintiff's left foot was "[t]ender [l]aterally." *Id.* Plaintiff underwent an x-ray, the result of which was "negative." *Id.* Plaintiff had previously refused treatment for his left foot at Tennessee State Prison (TR 410, 484), but on December 28, 1984, he accepted treatment for a "chipped bone" in the same foot at Fort Pillow (TR 409).[13]

On January 22, 1985, Plaintiff underwent surgery for his hemorrhoids.[14] TR 481. On February 28, 1985, Plaintiff was treated for "passing bright red blood from [the] rectum." TR 483. On March 1, 1985, Plaintiff complained of internal and external hemorrhoids (TR 404), and was instructed to start a "high fiber diet" on March 4, 1985, and to continue the diet until April 3, 1985 (TR 403; 479).

On April 11, 1985, Plaintiff was treated for "sore leg muscles" that occurred as a result of

---

[12]The date is somewhat illegible, but it appears to be "1/2//85." TR 484.

[13]The record does not indicate any further treatment, and the signature is illegible. TR 408-409.

[14]The record does not indicate any further treatment, and the signature is illegible. TR 481.

his attempted "escape." TR 390. Plaintiff had a "normal physical exam" and there were "no abnormalities noted." *Id.*

Plaintiff's Health-Related Work Classification Summary ("WCS"), dated October 13, 1985, indicated: "Class B - Limited Duty"; "Grade 1 - Minor Attention Required"; "Unknown" "Mental Health Treatment History"; and "Disabilities/Limitations" because of "Gastrointestinal Disorder/Disease." TR 235.

On February 19, 1986, Plaintiff complained of a "long term" history of hemorrhoids, rectal bleeding, and painful bowel movements. TR 475. Plaintiff was instructed to take "stool softeners." *Id.*

On March 10, 1986, Plaintiff signed a "release from medical responsibility," which indicated that he "refused to sign & refused to be seen" by "Dr. Pasi in [the] general surgery clinic." TR 486.

On May 11, 1986, Plaintiff complained of "very sore muscles" in his upper back and pain in his left arm. TR 472. Plaintiff's physical examination revealed "point tenderness" in his right, upper back, which worsened with "twisting" of the upper body or downward "extension" of the neck. *Id.* Plaintiff was instructed to use "balm," take warm showers, and decrease his activity for five days. *Id.*

On September 19, 1986, Plaintiff's HCS contained a "[t]reatment [r]ecommendation" of "Grade 2 - Periodic Attention Required" and a "disability code" for a "Hearing Impairment." TR 239.

Also on September 19, 1986, Ms. Nanette Vasquez conducted Plaintiff's "Health

9

History" evaluation.[15]  TR 254.  Ms. Vasquez noted Plaintiff's hepatitis C, "hemorrhoids," and rectal "bleeding."[16]  *Id.*

An x-ray of Plaintiff's spine, dated October 1, 1986, revealed "[m]ild narrowing of [...] disc spaces; otherwise negative."[17]  TR 295.

On March 17, 1987, Dr. C.J. Corea treated Plaintiff for an injury to his right hand from a "piece of metal."  TR 473.  Dr. Corea ordered an x-ray of Plaintiff's fourth finger on his right hand, which revealed that he had a "normal right fourth finger."  TR 294.

On September 8, 1987, Plaintiff was evaluated as being able to perform "Class A - Full Duty" and had a "[t]reatment [r]ecommendation" of "Grade 1 - Minor Attention Required."  TR 381.

On September 18, 1987, Plaintiff had a WCS, which indicated: "Class A - Full Duty"; "Grade 1 - Minor Attention Required"; "Unknown" "Mental Health Treatment History"; and "Disabilities/Limitations" because of a "Hearing Impairment."  TR 237.

Also on September 18, 1987, Plaintiff underwent a physical examination, which revealed "normal" results in all areas except for "int/ext hemorrhoids."[18]  TR 228.

On September 23, 1987, Plaintiff went to the emergency room (TR 378), was assessed as having the ability to perform "Class A - Full Duty," and received a "[t]reatment

---

[15]The record does not indicate Ms. Vasquez's professional title.  TR 254.

[16]The record does not indicate any further treatment.  TR 249-254.

[17]The record does not indicate any further treatment, and the signature is illegible.  TR 295.

[18]The record does not indicate any further treatment or contain a signature.  TR 228.

[r]ecommendation" of "Grade 1 - Minor Attention Required" (TR 380).[19]

On April 5, 1988, Plaintiff was admitted to the Tennessee State Prison Hospital for an "evaluation of internal hemorrhoids." TR 243. Plaintiff complained of "rectal pain," and underwent surgery to remove his hemorrhoids; the attending physician noted that Plaintiff had "prolapse of rectum." TR 470. An x-ray report from April 6, 1988 indicated that there was "no obstruction" in Plaintiff's colon.[20] TR 289. On April 11, 1988, it was recommended that Plaintiff begin a "high fiber" diet.[21] TR 467-468.

On September 1, 1988, Plaintiff complained of "sharp pain" in his left hand that lasted for two weeks, and "point tenderness" on the fourth and fifth joints of his left hand. TR 285. An x-ray of Plaintiff's hand revealed "no pathology." TR 285. Plaintiff was given Motrin for the pain.[22] TR 466.

On September 9, 1988, Plaintiff complained of pain in the muscles of his right arm, but manifested a "full range of motion" and "no point tenderness" during his examination, and an x-ray revealed "negative R arm and elbow." TR 284; 401; 465-466.

On September 15, 1988, Plaintiff complained of "rectal pain." TR 464. Plaintiff was scheduled to undergo a colonoscopy on September 27, 1988 (TR 398), but he refused to undergo

_____

[19]The record does not indicate the reason for Plaintiff's emergency room visit. TR 378.

[20]Two April 1988 laboratory reports for "CEA-Abbott Monoclonal" revealed "out of range" results. TR 286; 288.

[21]On April 13, 1988, Plaintiff requested a "high residue" diet to continue until May 13, 1988. TR 377. Plaintiff requested a "high fiber" diet from May 26, 1988 to June 26, 1988 (TR 402), from September 15, 1988 to October 15, 1988 (TR 400), from October 13, 1988 to November 13, 1988 (TR 395), and from November 28, 1988 to December 28, 1988 (TR 394).

[22]The record does not indicate any further treatment, and the signature is illegible. TR 285; 466.

the procedure (TR 399).[23]

On December 15, 1988, Plaintiff complained of pain in his hand that he believed was the result of a "stabbing wound" that had occurred "several years ago." TR 461. Upon physical examination, Plaintiff's hand had "no abnormalities." *Id.* Plaintiff was assessed as having "tendinitis," and was prescribed Tolectin, and was instructed to take "warm soaks." *Id.*

On January 10, 1989, Plaintiff requested a "high fiber" diet.[24] TR 393.

In March of 1989, Plaintiff complained of problems with his left hand, as well as "low back pain" that radiated to his leg; he asserted that he had a history of "slipped disc" and "pinched nerve." TR 458-459. On May 31, 1989, Plaintiff underwent an x-ray of his "L-5 spine," which revealed "normal" results. TR 276. On June 1, 1989, Plaintiff had a CT scan of his "lumbosacral spine," which revealed "schmorl's nodes" and a "[s]mall herniated disc at the L5-S1 disc space." TR 275; 456-458.

From June 12, 1989 to July 6, 1989, Plaintiff was treated for "recurrent" lower back pain, and "admitted for epidural steroids injection." TR 455.

On August 16, 1989, Dr. Patrick Lecorps treated Plaintiff for his complaint of "[c]hronic low back pain," and he administered an "[e]pidural steroid injection." TR 241-242. On August 24, 1989, Dr. Lecorps found that Plaintiff's back pain was "improved since epidural steroid injection." TR 448-449; 450-451.

On March 13, 1990, Licensed Practicing Nurse, Susie Hatcher, treated Plaintiff for

---

[23]These records are unsigned. TR 398; 399; 464.

[24]Plaintiff also requested this diet from March 27 1989 to April 29, 1989, (TR 391-392), from November 29, 1989 to December 29, 1989 (TR 371, 376), and from July 26, 1990 to August 26, 1990 (TR 372).

Case 2:04-cv-00079   Document 20   Filed 02/24/06   Page 12 of 76 PageID #: 12

internal hemorrhoids, and noted his painful bowel movements.  TR 446.  Nurse Hatcher referred

Plaintiff to a "PA."[25]  *Id.*

In September 1990, Plaintiff had multiple assessments for his complaints of a "pullled

muscle" in his left arm, and he was referred to "PA for assessment."[26]  TR 444.  On November

21, 1990, Plaintiff underwent an x-ray of his left hand, which  revealed "no fracture or bony

pathology."[27]  TR 273.

On November 28, 1990, Physicians' Assistant, Lori Bourne, evaluated Plaintiff for pain

in his left arm and right wrist, which was found to be "probable osteoarthritis."  TR 442-443.

Ms. Bourne indicated that Plaintiff was "on ASA for anti[-]inflammatory."[28]  TR 442.

Also on November 28, 1990, Ms. Bourne conducted another WCS, which indicated:

"Class A - Full Duty" and "Grade 1 - Minor Attention Required."  TR 234.  Ms. Bourne's

physical examination of Plaintiff revealed an "overall well adult," and she referred him to other

physicians for treatment of "tendinitis" in his right wrist, hemorrhoids, rectum prolapse, and

problems in his "G.U. system."  TR 227.  Ms. Bourne recorded Plaintiff's "Health History,"

noting that he had hepatitis C, "prolapsed rectum," "rash on [his] shoulder," "swelling" in his

"neck, armpits, groin or other areas," hemorrhoids, bleeding, constipation, rectal pain, "elbow

arthritis," and "stiff or painful muscles or joints" in his hands.  TR 221-226.

On December 11, 1990, Plaintiff was treated for a "painful" right "1st metacarpal base,"

_____

[25]The record does not indicate any further treatment.  TR 446.

[26]There are multiple entries on this document, and none of the signatures is legible.  TR 444.

[27]The signature is illegible.  TR 273.

[28]The record does not indicate any further treatment.  TR 442.

and his "level flexor [which was] tender to [right] thumb."  TR 442.  Upon examination, Plaintiff

manifested "full ROM" in the right thumb.  *Id.*  Plaintiff was assessed as having "no evidence of

neurovascular deficit" and "tendinitis of FPL."  *Id.*  Plaintiff received Naprosyn for the pain.  *Id.*

On April 19, 1991, Dr. Harold Thompson evaluated a CT scan of Plaintiff's "lumbosacral

spine" which revealed a "2-3 mm bulging disc at L4-L5" and a "4 mm bulging disc" at "L5-S1."

TR 271-272; 440.  Dr. Thompson suggested that Plaintiff undergo an MRI of his spine because

of the "schmorl's nodes seen from approximately L1 through L3 which may indicate

degenerative disc disease at a higher level."[29]  TR 271-272.

On May 8, 1991, Dr. Winston Griner treated Plaintiff for back pain.  TR 437-438.  Dr.

Griner ordered another "epidural steroid injection w/ Dr. M. Lecorp" for Plaintiff's "herniated

disc."  *Id.*

From June 26, 1991 to August 20, 1991, Plaintiff complained of "tendonitis" in his left

arm and elbow, and was referred to "Dr. Boatwright."  TR 433-434.  An x-ray of Plaintiff's left

elbow, dated July 24, 1991, indicated "no fracture, dislocation or other abnormality."[30]  TR 270;

432.

On August 20, 1991, Dr. Andani S. Prakash performed "Nerve Conduction" studies and

"Electromyographic" studies on Plaintiff.  TR 267-268.  Dr. Prakash interpreted the findings and

determined that Plaintiff's results were "[c]onsistent with" "left carpal tunnel syndrome with

evidence of Active Denrvation [*sic*]."[31]  TR 268; 430.

---

[29]There is no record of an MRI conducted in proximity to this date.  TR 271-272.

[30]The record does not indicate any further treatment.  TR 270-432.

[31]The handwritten notes from Plaintiff's August 20, 1992 visit with Dr. Prakash are
illegible.  TR 240.

14

On January 7, 1992, Licensed Practicing Nurse, B. Powell, recorded Plaintiff's "Health History," including his "trouble with bowel movements," hemorrhoids, bleeding, constipation, and rectal pain, and the "lumps or swelling" in his "neck, armpits, groin or other areas."  TR 212-217.

On January 15, 1992, Plaintiff underwent a physical examination, which revealed that his ear canals were "moderately hyperemic," and that he had a "small palpable nodule underneath skin (2cm) at the base of xyphoid process" in his abdomen.[32]  TR 248.  Additionally, Plaintiff had a "prolapse[d] rectum," two "slipped disc[s]," and "otitis externas (bilateral)."[33]  *Id.*

Also on January 15, 1992, Plaintiff underwent another WCS evaluation, which indicated: "Class B - Limited Duty"; "Grade 1 - Minor Attention Required"; "Disabilities/Limitations" because of "Speech Impairment (slight)" and "Orthopedic Disease/Disorder."  TR 231. Plaintiff's "Specific Work Restrictions" included: "[m]edium work only -- lifting 100 lbs. maximum, able to frequently lift or carry objects weighing up to 50 lbs"; "[n]o stooping or bending"; "[s]hould be housed on first floor/bottom bunk, no climbing and balancing"; and "[s]hould not participate in weight lifting or strenuous athletics."  TR 232.

Additionally on January 15, 1992, Dr. Boatwright treated Plaintiff for his complaint of "back pain."  TR 427-428.  Dr. Boatwright prescribed Motrin to help Plaintiff manage his "episodical back pain."[34]  TR 427.

On January 16, 1993, Plaintiff signed a "refusal of medical services" form, in which he

---

[32]This record is unsigned.  TR 248.

[33]The record does not indicate any further treatment, nor does it contain a signature.  TR 248.

[34]The record does not indicate any further treatment.  TR 427.

15

refused a "PPD" procedure against the advice of a physician.  TR 367.

On January 19, 1993, Plaintiff had another physical examination (TR 244-247), which revealed hemorrhoids and bleeding, following Plaintiff's complaint of rectal pain (TR 247).[35]

On February 19, 1993, Ms. Teresa Martin completed a "Medical Report on Entry, Transfer, and Release" form.[36]  TR 360.  Ms. Martin indicated that Plaintiff could perform "Class B - Limited Duty" and indicated that his back pain as "Grade 2 - Periodic Attention Required." *Id.*

On February 22, 1993, Ms. Edith Underwood conducted an "Inmate Chart Review," which indicated that Plaintiff had a chronic "back pain."[37]  TR 359.

On March 12, 1993, Plaintiff was treated because his "back went out," and he was advised to continue using Motrin.[38]  TR 597.

On March 16, 1993, Plaintiff submitted a "Modified Diet Request" form requesting "[r]egular diet to unit," citing "lumbar strain"; he renewed the request to have his meals delivered until March 23, 1993.  TR 352-357.

On March 20, 1993, Licensed Practicing Nurse Dotti Brewer recorded Plaintiff's complaint that his back was "no better," and that a "shot he gave me didn't help any at all."  TR 595.  Nurse Brewer also recorded Plaintiff's request that, "I need another diet order because I

---

[35]The Administrative Record appears to be missing pages from this evaluation, as the document begins with section "u" of category "4."  TR 244.  The record does not indicate any further treatment, and the signature is illegible.  244-247.

[36]Ms. Martin's title is illegible.  TR 360.

[37]Ms. Underwood's title is illegible.  TR 359.

[38]The record does not indicate any further treatment, and the signature is illegible.  TR 597.

16

can't stand to walk up to that kitchen and back." *Id.* Nurse Brewer referred Plaintiff "to [an] M.D." *Id.*

On April 6, 1993, Dr. Delvin E. Littell completed another WCS for Plaintiff, which indicated: "Grade 2 - Limited Duty"; "None" regarding "Mental Health Treatment History"; and "Disabilities/Limitations" because of "Orthopedic Disease/Disorder" and a "Prolapsed Rectum." TR 229. Dr. Littell detailed Plaintiff's "[s]pecific [w]ork [r]estrictions" including: "[n]o heavy lifting -- lifting 20 lbs. maximum, able to frequently lift or carry objects weighing up to 10 lbs."; "[n]o continuous strenuous activity for extended periods of time"; "[n]o continuous standing or walking for extended periods of time"; "[n]o stooping or bending"; "[s]hould be housed on first floor/bottom bunk, no climbing and balancing"; "[s]hould not participate in weight lifting or strenuous athletics," and "[n]o continuous sitting over 30 min." TR 230.

On February 15, 1994, Nurse Brewer evaluated Plaintiff, using a "Medical Report on Entry, Transfer, and Release" form, for problems with his "lumbar disc" and his "prolapsed rectum." TR 350. Nurse Brewer found that Plaintiff was able to perform "Class B - Limited Duty," and indicated his condition as "Grade 2- Periodic Attention Required." *Id.*

On February 17, 1994, Ms. Carolyn Dailey conducted a "Health Screening" of Plaintiff, and indicated that he was receiving treatment for "back problems."[39] TR 348. On February 18, 1994, Ms. Dailey evaluated Plaintiff as "Class B - Limited Duty" and "Grade 2 - Periodic Attention Required." TR 336.

On May 20, 1994, Ms. Tracy Garrett[40] recorded Plaintiff's emergency room visit for

---

[39]Ms. Dailey's title is illegible. TR 348.

[40]Ms. Garrett's title is illegible. TR 511.

"back pain." TR 511. Plaintiff was diagnosed with a "pulled muscle" and was instructed to apply "warm moist heat" and perform "lower back exercises." *Id.*

On June 15, 1994, Physicians' Assistant Lyall Craft recorded that Plaintiff reported injuring his back while "pulling on [a] mattress." TR 592. Plaintiff was instructed to continue "IBP x 5 days." *Id.*

On November 15, 1994, Plaintiff was evaluated using a "Health Status/Transfer Summary," and was found to have "[m]oderate" impairments in his "extremities." TR 327. On November 29, 1994, Licensed Practicing Nurse Breta Stewart completed another "Health Status/Transfer Summary" assessment of Plaintiff, and noted that Plaintiff did not have any limitations or medications. TR 326.

On January 18, 1995, Dr. Littell examined Plaintiff and noted that Plaintiff had a "small lipoma" on his abdomen and right forearm.[41] TR 210. Dr. Littell reported that Plaintiff's "Major Medical Conditions/Problems" were "Prolapsed Rectum" and "HNP."[42] TR 208.

On June 4, 1995, Plaintiff's "Health Status/Transfer Summary" revealed "[m]oderate" activity limitations, and noted his January 18, 1995 physical examination. TR 320.

On May 3, 1996, Registered Nurse Robin Warner[43] treated Plaintiff because his "back went out." TR 500. Nurse Warner noted Plaintiff's "[l]imited ROM" while bending and walking, and indicated that he had "[c]hronic back pain" from his injury in 1975. TR 500-501. Nurse Warner instructed Plaintiff to apply "ice to back, [and] rest as much as possible." TR 501.

---

[41]The record does not indicate any further treatment. TR 210.

[42]The handwritten comments next to "HNP" are illegible. TR 206.

[43]The signature is difficult to read, but appears to be "Robin Warner." TR 501.

18

Also on May 3, 1996, Plaintiff requested meal delivery to his unit for four days, and renewed that request to continue until May 13, 1996.  TR 493-494; 497; 499.

On May 6, 1996, Dr. Littell treated Plaintiff for "[b]ack strain."  TR 587.  Dr. Littell reported that Plaintiff stated that he did not wish to go to the emergency room.  *Id.*  Dr. Littell prescribed "meds to unit."  *Id.*  Also on May 6, 1996, a "Limited Activity Notice" restricted all of Plaintiff's activities until May 12, 1996.  TR 498.

On May 10, 1996, Registered Nurse Trudy Hedgecough completed an "emergency room care" form, recording Plaintiff's complaints of "back pain," and his statement, "[i]t's hurting lying in bed."  TR 495.  Nurse Hedgecough instructed Plaintiff to continue to have his "meals delivered," and to "avoid strenuous exercise."  *Id.*  Additionally, Nurse Hedgecough reiterated limitations on Plaintiff's activities until May 12, 1996.  TR 496.  Specifically, Nurse Hedgecough stated that Plaintiff was "[r]estricted from physical activity including participation in sports," was "[u]nable to work a regularly scheduled assignment," and "[m]ay walk outside, continue to use cane."  TR 496.

On August 26, 1996, Ms. Gail Denney[44] indicated that Plaintiff was paroled, and did not receive any medications upon his release.[45]  TR 586.

**2.  Plaintiff's Medical Records Following His Release from Prison**

On September 23, 1996, Dr. E. Dewey Thomas consulted with Plaintiff on behalf of

--------

[44]Ms. Denney's title is unknown.  TR 586.

[45]The Court notes that the record contains a series of forms from the Tennessee Department of Correction, entitled "Monthly Medication Sheet" or "Medication Administration Record," and dating from September 1993 to August 1996.  TR 317-319; 321-324; 328-331; 333-334; 337-344; 520-539; 543-545; 548-552; 555-558; 560-565; 568-569; 571-572; 574-578; 582-585.

19

Tennessee Disability Determination Services ("DDS").  TR 598-599.  Dr. Thomas recorded that

Plaintiff stated that he had injured his back when he lifted "some heavy metal rods" 20 years

previously, and that this injury has caused him chronic pain.  TR 598.  Dr. Thomas also recorded

that Plaintiff had received four "epidural steroids injections."  *Id.*  Dr. Thomas noted that an x-

ray of Plaintiff's lumbar spine was "essentially within normal limits" with a "minimal disk space

narrowing at L5-S1."  *Id.*  Upon physical examination, Dr. Thomas found that Plaintiff had

"some muscle tightness in the mid and lower lumbar spine areas."  *Id.*  Dr. Thomas opined that

Plaintiff could "occasionally lift and carry 30 pounds and frequently 10 pounds.  He should be

able to stand and walk six hours in an eight-hour workday and sit six hours in an eight-hour

workday."  TR 589-599.

On October 2, 1996, Dr. Morse Kochtitsky completed a Physical Residual Functional

Capacity ("RFC") Assessment of Plaintiff.  TR 134-141.  Dr. Kochtitsky found that Plaintiff

could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand

and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour

workday, and push and pull without limitation.  TR 135.  Dr. Kochtitsky further noted that

Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  TR

136-138.  Dr. Kochtitsky reported that there were treating/examining source conclusions in

Plaintiff's record that were significantly different than his findings, and cited source "1AC."  TR

140.

On October 3, 1996, Ms. Sherry H. Tubb evaluated Plaintiff at the Plateau Mental Health

Center ("PMHC"), upon referral from the parole board.[46]  TR 636-640.  Ms. Tubb recorded that

---

[46]Ms. Tubb's title is unknown.  TR 638.

Plaintiff had been incarcerated for 24 years because "[h]e and [his] uncle robbed a store/used a sawed off shotgun." TR 637. Ms. Tubb found that Plaintiff met the criteria for "Intermittent Explosive Disorder." *Id.* She opined that Plaintiff's problem was "severe," and that he had "moderate disturbance of functioning in all areas of his life." TR 637-638. Ms. Tubb assessed Plaintiff as follows: "Axis I: 312.34 Intermittent Explosive Disorder. Axis II: 079.99 Diagnosis Deferred. Axis III: has 2 bad discs in his back. Axis IV: released a month ago after 24 yrs. in prison; disabled; no job," and "Axis V: GAF, Current = 55." TR 638.

On November 18, 1996, Dr. Ferdinand Armas conducted a psychiatric evaluation of Plaintiff. TR 632-633. Dr. Armas reported that Plaintiff had engaged in fights while in prison, and that he had been treated with "some psychotropic medications" including "Thorazine, Mellaril, Librium, Stelazine and Valium." TR 632. Dr. Armas noted that Plaintiff reported "feeling depressed most of the time, almost everyday for years." *Id.* Dr. Armas assessed Plaintiff as follows: "Axis I: 300.40, Dysthymic disorder[,] 300.22 Agoraphobia"; "Axis II: Antisocial personality traits"; "Axis III: Slipped disc"; "Axis IV: "Spent 24 years in prison"; and "Axis V: Current GAF: 50; usual: 60."[47] TR 633. Dr. Armas suggested that Plaintiff "may benefit from antidepressant medications." *Id.*

On June 2, 1997, Dr. James Anderson treated Plaintiff for his complaint of "left arm pain and numbness for the past five years with median nerve distribution pain and numbness constantly for the past three months." TR 600. Dr. Anderson performed multiple "nerve

---

[47]A handwritten record with similar information occurs at TR 629, but does not have a date. There is also a series of handwritten "outpatient progress notes" which supplement typewritten notes. TR 617; 619-623; 625-628; 631. These handwritten notes are largely illegible, but seem to indicate that Plaintiff received treatment until November 1997, and then resumed treatment on March 18, 1998. *Id.*

Case 2:04-cv-00079   Document 20   Filed 02/24/06   Page 21 of 76 PageID #: 21

conduction studies," and found that Plaintiff had "moderate to severe left carpal tunnel syndrome," "significant right carpal [tunnel] syndrome," and "no needle EMG evidence of a cervical radiculopathy." TR 600-601.

On June 16, 1997, Dr. Lucia Corro evaluated Plaintiff's complaints of carpal tunnel syndrome, hepatitis A and B, and lower back pain. TR 606. Dr. Corro ordered laboratory work (TR 608-612), and ordered an "abdominal ultrasound," which revealed "[m]iminal aneurysmal dilation of the distal abdominal aorta" (TR 607). Dr. Corro completed a "Medical Request for Exemption," in which she indicated that Plaintiff should be exempted from a weekly work requirement for receiving "foodstamps," because his "carpal tunnel syndrome" led to four to six months of "disability/incapacity." TR 605.

On June 18, 1997, Dr. S.M. Smith treated Plaintiff for complaints of "painful hands left greater than right," and "difficulty doing anything w/the left hand b/c of the sensation aberrations." TR 645. Upon physical examination, Dr. Smith noted "decreased sensation to pinprick in the thumb, index, long, and radial half of the ring finger w/good sensation in the little finger and the ulnar half of the ring finger." *Id.* Dr. Smith diagnosed Plaintiff with "median nerve compression, left wrist," scheduled "EMG/NCS to further evaluate this," and prescribed Lortab instead of Naprosyn, which Plaintiff stated was "not helping at all." *Id.*

On July 2, 1997, Dr. Smith noted that Plaintiff's "EMG results show a moderate to severe left carpal tunnel syndrome and a significant right carpal tunnel." TR 642. On July 18, 1997, Dr. Smith indicated that he was willing to perform surgery to alleviate Plaintiff's carpal tunnel syndrome, but was concerned about Plaintiff's lack of insurance coverage. TR 644.

On March 18, 1998, Dr. J.T. DeBerry evaluated Plaintiff. TR 615-618. Dr. DeBerry

found that Plaintiff had "Major Depression," and that he was "unable to demonstrate abstract reasoning," but that his judgment was "adequate to make reasonable life decisions." *Id.*

On March 19, 1998, Plaintiff telephoned Dr. Smith's office to request pain medication, but Dr. Smith stated that a refill would require another consultation. TR 642.

On March 20, 1998, Licensed Practicing Nurse A. Farley recorded that Plaintiff sought treatment at "CMC" for his hepatitis C and "carpal tunnel syndrome."[48] TR 650. Nurse Farley referred Plaintiff to a doctor in Nashville.[49] *Id.*

On March 31, 1998, Dr. Richard A. Howerton treated Plaintiff for hemorrhoids and rectal prolapse. TR 647. Upon physical examination, Dr. Howerton noted that Plaintiff had "prolapsed hemorrhoids" and a "tremendous amount of scarring." *Id.* Dr. Howerton's impression was that Plaintiff had "[l]arge prolapsing external and internal hemorrhoids," and he recommended that Plaintiff undergo a "colonoscopy" and a "hemorrhoidectomy." *Id.*

On April 8, 1998, Dr. Victor Pestrak completed a Mental RFC and PRTF of Plaintiff.[50] TR 175-187. In Plaintiff's RFC, Dr. Pestrak found that Plaintiff was "moderately limited" in his abilities to "understand and remember detailed instructions"; to "carry out detailed instructions"; to "maintain attention and concentration for extended periods"; to "work in coordination with or proximity to others without being distracted by them"; to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a

_____

[48]Plaintiff had two other appointments at CMC, on March 6, 1998 (TR 651) and April 3, 1998 (TR 649).

[49]The name of the referral doctor is illegible. TR 650.

[50]This doctor's name is derived from table of contents, as the signature on the form is illegible. TR 2.

consistent pace without an unreasonable number and length of rest periods"; to "accept instructions and respond appropriately to criticism from supervisors"; and to "respond appropriately to changes in the work setting." TR 175-176. Dr. Pestrak also found that Plaintiff was "markedly limited" in his ability to "interact appropriately with the general public."[51] TR 176. In Plaintiff's PRTF, Dr. Pestrak found that he had "[a]nxiety [r]elated [d]isorders," and "[p]ersonality [d]isorders," which were charactered by various symptoms.[52] TR 183-194. Dr. Pestrak indicated that Plaintiff had a "[s]light" degree of limitation with regard to his "Restriction of Activities of Daily Living"; a "[m]oderate" degree of limitation in regard to his "Difficulties in Maintaining Social Functioning"; and that Plaintiff "[o]ften" experienced "Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner." TR 186.

On May 14, 1998, Dr. Donita Keown consulted with Plaintiff on behalf of DDS. TR 652-654. Dr. Keown recounted Plaintiff's "history of lower back pain, abdominal aneurysm, carpal tunnel syndrome, hemorrhoid surgery, and hepatitis C." TR 652. Dr. Keown stated that Plaintiff reported that his back pain had begun in 1975, and that he had been diagnosed with "two herniated disks." *Id.* Dr. Keown recorded that Plaintiff's epidural steroid injections had provided "approximately one year of relief" from his lower back pain, but that he had experienced more pain that had extended into his "right lateral thigh" and that had lasted for about eight weeks. *Id.* Dr. Keown stated that Plaintiff used "over-the-counter Motrin and

---

[51]Dr. Pestrak's handwritten comments are generally illegible. TR 177.

[52]Dr. Pestrak indicated that Plaintiff's symptoms did not fit within the typewritten categories on the form; there are handwritten comments indicating symptoms, but they are illegible. TR 183-184.

heating pads to control pain," but that his back pain prevented him from being able to "walk erect." *Id.* Dr. Keown also recorded Plaintiff's history of abdominal aneurysm, for which Plaintiff asserted that his doctors had not offered any treatment. *Id.* Dr. Keown recorded Plaintiff's history of carpal tunnel syndrome, his "carpal tunnel release" procedure, his "nine"[53] prior hemorrhoid surgeries, and his hepatitis C. *Id.* Upon physical examination, Dr. Keown noted that Plaintiff had a "full range of motion in the remainder of planes with movement in both hips," that his "flexion" was to "40 degrees only" in his "thoracal lumbar column," and that he performed "only 5 degrees of extension with a reduction in lateral flexion to 15 degrees with no signs of scoliosis, spasm, or trigger points." TR 653. Dr. Keown noted Plaintiff's "tenderness in the right upper quadrant," and "full range of motion in the right wrist with a negative Tannal [*sic*] sign." TR 654.

On May 21, 1998, Dr. Orrin L. Jones Jr. completed a Physical RFC for Plaintiff. TR 188-195. Dr. Jones found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and pull without limitation. TR 189. Dr. Jones further noted that Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. TR 190. Dr. Jones added that Plaintiff could never climb a ladder, rope, or scaffolds. *Id.* Dr. Jones stated reported that Plaintiff was unlimited in his ability to reach and feel, but that he was limited in his ability to handle or finger objects. TR 191. No visual, communicative, or environmental limitations were reported. TR 191-192.

---

[53]Although the record contains repeated references to Plaintiff's 11 hemorrhoid surgeries, Dr. Keown wrote "nine." TR 652.

On June 3, 1998, Dr. DeBerry consulted with Plaintiff regarding Plaintiff's anxiety. TR 674. Dr. DeBerry stated that Plaintiff experienced "[o]ccasional visual hallucinations of shadowy figures," "anxiety inside," and "temper problems." *Id.* Dr. DeBerry prescribed Plaintiff Depakote and Zyprexa. *Id.*

On July 24, 1998, Ms. Kendall Bryan recorded that Plaintiff reported that he was "less depressed," and she reminded him of the importance of "taking his meds daily and as prescribed."[54] TR 671.

On July 13, 1998, Dr. Jefferson Crosier treated Plaintiff for "chronic hepatitis C," and "right upper quadrant fullness and pressure with nausea and weakness." TR 657. Dr. Crosier assessed Plaintiff as having "[h]epatitis C" and "[d]epression, chronic." *Id.* Dr. Crosier ordered a liver biopsy, which revealed "increased fibrosis," but was "[n]egative for malignancy." TR 656; 658-660. Dr. Crosier suggested that Plaintiff start "interferon therapy." TR 656.

On August 14, 1998, Ms. Bryan recorded Plaintiff's report that he was feeling "more alive," and that he had taken the correct dosage of medication for six of seven days, on average. TR 666. On September 9, 1998, Ms. Bryan recorded that Plaintiff reported that he had experienced "chills" from his hepatitis C shots and that he had continued to take his medication correctly for six of seven days, on average. TR 664.

On September 18, 1998, Plaintiff underwent a Clinically Related Group Assessment ("CRG").[55] TR 681-683. Plaintiff was found to have "moderate" limitations on his "activities of

---

[54]Ms. Bryan recorded many of the Case Management Notes for Dr. J.T. DeBerry. TR 664-666; 671. Ms. Bryan's title is unknown. *Id.*

[55]There is no signature on CRG forms; the form instructs the evaluator to include an identification number, and not a name. TR 681-683.

daily living" because of his "fear of crowds," which contributed to his inability to take public transportation. TR 681. Plaintiff was also found to have "moderate" limitations on his "interpersonal functioning," because of his "limited community support" and "fear of strangers." *Id.* Plaintiff was assessed as having "moderate" limitations on his "concentration, task performance and pace," because of his "difficulty with concentration." TR 682. Plaintiff was also assessed as having "moderate" limitations on "adaptation to change," because of his "difficulty adjusting to change." *Id.* Plaintiff was found to have "severe" impairments that had "accumulate[d]" for six months out of the previous year. *Id.* Plaintiff was classified as "Group 1 - Persons with Severe and Persistent Mental Illness." TR 683.

Also on September 29, 1998, Dr. Crosier indicated that Plaintiff reported experiencing increased "nervousness, agitation" as a result of the "interferon therapy." TR 656. Plaintiff requested more Valium, which Dr. Crosier did not provide. *Id.* Dr. Crosier referred Plaintiff to PMHC. *Id.*

From April 30, 1998 to October 28, 1998, Dr. DeBerry treated Plaintiff at PMHC.[56] TR 662-678. On June 1, 1998, Ms. Jennifer Vader recorded that Plaintiff stated that he had begun to experience severe headaches since starting Zyprexa, and that Plaintiff asserted that he had "blackouts, nausea, or severe headaches" with many of the medications that Dr. DeBerry had prescribed for him.[57] TR 675. Ms. Vader also noted that Plaintiff reported hearing voices, that he "no longer wants to see Dr. DeBerry," and that he was scheduled for an "emergency time appointment with Dr. Dominguez" on June 3, 1998. *Id.*

---

[56]Many of the handwritten notes are illegible. TR 662; 665; 670; 677-679.

[57]Ms. Vader's title is unknown. TR 675.

27

On October 19, 1998, Dr. Crosier indicated that Plaintiff had "failed to keep his appointments and followups," and that he had informed Plaintiff that "just his chronic Hepatitis C would not be grounds for any type of disability." TR 707. On November 2, 1998, Dr. Crosier evaluated Plaintiff after three months of "interferon" therapy and noted that Plaintiff's "constitutional symptoms" might indicate that he needed different treatment. TR 708. On November 17, 1998, Dr. Crosier indicated that Plaintiff was "doing much better" after stopping the "interferon" therapy, but that he might need more "interferon" therapy. TR 709.

On December 22, 1998, Ms. Bryan recorded that Plaintiff returned to PMHC and stated that his hepatitis C shots were suppressing his appetite. TR 699. Ms. Bryan also recorded that Plaintiff reported that his condition was "improved" since his previous consultation.[58] TR 699.

On January 11, 1999, Ms. Bryan recorded that Plaintiff was in "massive back pain," and that he was still receiving his hepatitis C shots.[59] TR 697; 705.

On January 19, 1999, Dr. Rana treated Plaintiff at the Cookeville Medical Center ("CMC") for lower back pain, which was in a "persistent pattern for 10 days," "characterized as stabbing," extending "to the right thigh," and "aggravated by prolonged standing." TR 857-858. Dr. Rana ordered laboratory work, and assessed Plaintiff's condition as "chronic hepatitis" and "carpal tunnel syndrome." TR 859.

On January 21, 1999, Plaintiff was treated at the PMHC emergency room because he was involved in a "traffic accident," which exacerbated his neck and back pain. TR 696.

---

[58]The record also contains treatment notes from December 17, 1998, however, these notes are generally illegible. TR 700.

[59]The record does not indicate any further treatment. TR 697, 705.

28

On February 8, 1999, Dr. Brij Rana completed a "Medical Assessment of Ability to do Work-Related Activities (Physical)" form regarding Plaintiff. TR 684. Dr. Rana stated that Plaintiff's "lifting/carrying" were affected by his impairment, citing "CT lumbar spine 4/91." *Id.* Dr. Rana asserted that Plaintiff could "[o]ccasionally" "lift and/or carry" ten pounds, and "[f]requently" "lift and/or carry" "less than ten" pounds. *Id.*[60] Dr. Rana opined that Plaintiff's "standing/walking" were affected by the impairment, and that Plaintiff could "stand and/or walk" for "100 meters" total. TR 685. Dr. Rana assessed that Plaintiff could sit for 20 minutes without interruption. *Id.* Dr. Rana found that Plaintiff could occasionally climb, balance, and crouch.[61] *Id.* Dr. Rana indicated that Plaintiff's "[r]eaching" and "pushing/pulling" were "affected by his impairment." TR 686. Dr. Rana also stated that Plaintiff had environmental restrictions, which included heights, moving machinery, temperature extremes, chemicals, and fumes. *Id.* Dr. Rana asserted that Plaintiff's limitations were "normally expected from the type and severity of the diagnoses in this case," and that the diagnoses were "confirmed by objective findings" and by Plaintiff's "subjective complaints." TR 688.

Also on February 8, 1999, Dr. Rana treated Plaintiff for "moderate" and "recurrent" "calf pain." TR 855. Upon physical examination, Dr. Rana noted "[r]ange of motion decreased and [m]ovements painful."[62] TR 856.

---

[60]There is a second copy of this evaluation (TR 717-721), which is identical to the first, except for a handwritten statement that Plaintiff's ability to "[f]requently" lift and/or carry "less than ten" pounds is limited to "less than two hrs daily." TR 717.

[61]Dr. Rana marked a check mark for the categories listed above, but indicated two "X" marks next to "kneel," "crawl," and "stoop." TR 685.

[62]This record appears to be incomplete, as the last word on the last page of this record is truncated. TR 856. Further, there is no indication of diagnoses or treatment plans. TR 855-856.

29

On March 23, 1999, Dr. Crosier treated Plaintiff for hepatitis C, weakness, and fatigue, noting that Plaintiff had ceased his "interferon" therapy because it had caused him "increased depression and hallucinations." TR 710. Dr. Crosier observed that Plaintiff was "better overall since adding Zoloft to his regimen." *Id.*

On April 6, 1999, Dr. Rana noted that Plaintiff had "[j]oint [s]tiffness and [j]oint [p]ain."[63] TR 851.

On May 7, 1999, Dr. Griner treated Plaintiff for "lower back" pain that radiated to the leg, numbness, and tingling. TR 712-714. Dr. Griner conducted a "neuro-selective CPT laboratory report." *Id.* On June 8, 1999, Dr. Griner again treated Plaintiff for lower back pain, characterizing Plaintiff's back pain as "chronic," and prescribing medications for his pain.[64] TR 711.

Also on June 8, 1999, Dr. DeBerry treated Plaintiff for "depression, social isolation, insomnia, [and] extreme paranoia."[65] TR 1032-1034. Dr. DeBerry assessed Plaintiff with the following: "Axis I: Dysthymic D/O, Psychotic D/O, NOS, Agoraphobia and History of Panic D/O"; "Axis II: Anti Social Personality traits"; "Axis III: "Slipped disc"; "Axis IV: Spent 24 yrs in Prison"; and "Axis V: 55." TR 702-704. Dr. DeBerry noted that Plaintiff's hepatitis C was in "remission," and that he was "starting to feel better." TR 701.

_____

[63]Dr. Rana's records do not indicate a treatment plan or list prescription medications. TR 849-851. The record also contains an April 9, 1999 MRI of Plaintiff's lumbar spine, which revealed "[r]ight pericentral disc herniation at the L2-3 level producing effacement of the thecal sac but no definite nerve root involvement." TR 715. There is no signature on the MRI. *Id.*

[64]The remaining treatment notes are illegible. TR 711.

[65]There is a duplicate of this evaluation at TR 702-704, and both copies have three dates listed on the document.

30

Dr. Rana examined Plaintiff on June 21, 1999, and noted that the joint pain and stiffness that Plaintiff had reported on April 6, 1999 were no longer present.[66]  TR 849.

On July 26, 1999, Ms. Bryan completed a "Case Management Service Plan."  TR 1031.  Ms. Bryan assessed Plaintiff's "risk factors," and noted that his depression decreased when he followed his prescription.  *Id.*  She provided him with specific steps to follow as part of "crisis plan," if he found himself exhibiting "[w]arning [s]igns."  *Id.*

On August 11, 1999, Dr. Rana treated Plaintiff for "[b]il hand pain," as well as "nausea."  TR 848.  On November 10, 1999 and December 21, 1999, Dr. Rana treated Plaintiff for "increasing" and "stabbing" lower back pain, with "no relieving factors."[67]  TR 846.

On March 3, 2000, a "Case Management Service Plan" form, with a supervising signature from Ms. Rhonda Gentry, indicated that Plaintiff had "problems associated with medication," and "paranoia associated with strangers."[68]  TR 1025.

On March 30, 2000, Ms. Betty Brotherton recorded that results of an MRI that indicated "[r]ight pericentral disc herniation at the L2-3 level producing effacement of the thecal sac but no definite nerve root involvement"'; an x-ray of Plaintiff's "lumbar spine," which indicated "mild scoliosis which may be due to positioning or perhaps muscle spasm"; and an "ultrasound of the aorta," which was "normal."[69]  TR 843.  On April 6, 2000, Dr. Rana recounted the results

---

[66]The record contains no further information regarding treatment.  TR 849.

[67]The record does not indicate any further treatment.  TR 846.

[68]The record does not indicate Ms. Gentry's title, and the signature of the case manager is illegible.  TR 1025.

[69]Ms. Brotherton's title is unknown.  TR 843.  The record does not indicate who ordered the MRI, x-ray, and ultrasound.  *Id.*

31

of Plaintiff's aforementioned MRI, x-ray, and ultrasound. TR 841. Dr. Rana recorded the findings of a consultation with a gastroenterologist, Dr. Allan H. Bailey, who recommended that Plaintiff should "consider treatment with a combination of ribavirin and interferon." *Id.* Dr. Rana prescribed "Risperdal."[70] TR 842.

On June 26, 2000, Dr. Rana treated Plaintiff for "bil hand pain x 2 wks." TR 839. Upon physical examination, Dr. Rana found that Plaintiff had "cramping" in "both hands" and "arthritis." TR 839. Dr. Rana prescribed Darvoset. TR 840.

On May 25, 2000, Plaintiff underwent another CRG evaluation, which indicated no change from his previous September 18, 1998 CRG except for the evaluator's comments.[71] TR 985-987. Plaintiff was assessed as having "moderate" limitations; as needing "little aid in handling and completing ADL's"; and as needing an "extensive support system, to include PMHC staff" to help with "interpersonal functioning." TR 985-986. The evaluator also noted that Plaintiff "maintains concentration with little to no prompting" and "does well in adapting to change." *Id.*

On March 9, 2001, Dr. William Y. Low treated Plaintiff at Baptist Dekalb Hospital Emergency Department because Plaintiff's "back went out" when he "stumbled on [the] driveway last night." TR 882-890. Dr. Low diagnosed Plaintiff as having "lumbosacral (joint) (ligament) sprain" and "overexertion and strenuous movements," (TR 882), for which he

---

[70]The record does not indicate any further treatment. TR 841-842.

[71]Plaintiff's March 21, 2001 and September 5, 2001 CRGs were unchanged from the May 25, 2000 CRG, and contained the same comments. TR 982-984. On April 24, 2002 and October 9, 2002, Plaintiff underwent two CRGs that were unchanged from all previous CRG's, except that there were no handwritten or additional comments. TR 976-978; 1122-1124.

Case 2:04-cv-00079   Document 20   Filed 02/24/06   Page 32 of 76 PageID #: 32

prescribed Toradol injections (TR 883-884), Robaxin (TR 886, 890), and Medrol (TR 890).

On March 21, 2001, Dr. DeBerry assessed Plaintiff's mental status as "normal." TR 1011. On April 26, 2001, Dr. Erich Sperker treated Plaintiff at Baptist Dekalb Hospital Emergency Department for a "[l]eft elbow/"[r]ight knee injury" (TR 873-881), for which he ordered x-rays that revealed "[n]o significant soft tissue or body abnormalities" (TR 880-881). Dr. Sperker diagnosed Plaintiff with a "contusion of elbow." TR 873. Dr. Sperker prescribed "Demerol," "Phenergan," and "Lortab." TR 877.

On June 13, 2001, Dr. DeBerry evaluated Plaintiff's mental status as "subdued" affect, "narrow" range of affect, and "slow" "spch/tht process."[72] TR 1010.

On June 14, 2001, Dr. Linda Foster treated Plaintiff at Baptist Dekalb Hospital Emergency Department for "unbearable" back pain. TR 869-872. Dr. Foster diagnosed Plaintiff with "displacement of lumbar intervertebral disc without myelopathy" (TR 868), and prescribed Vicodin (TR 872).

A "Crisis Response Team Assessment" dated August 4, 2001, indicated that Plaintiff "had swallowed razor blades stating he felt suicidal" (TR 1005), and that he was assessed as having "problems relating to environment" (TR 1005-1009).[73]

On August 23, 2001, Dr. Sperker treated Plaintiff at Baptist Dekalb Hospital Emergency Department for "burning," "radiating," and "severe" back pain that radiated to the left arm, that was exacerbated by "movement," and that was relieved by remaining "supine" and "still." TR 861-867. Dr. Sperker ordered an x-ray of Plaintiff's "cervical spine," which revealed

---

[72]The record contains many handwritten notes that are illegible. TR 1004, 1010-1012.

[73]The signature on this assessment is illegible. TR 1009.

"degenerative changes" in the "posterior elements." TR 866. Dr. Sperker's "clinical impression" was that Plaintiff had "chronic" neck pain and "[d]egenerative [d]isc [d]isease." TR 862.

On August 24, 2001, Dr. J. David Seber treated Plaintiff for his a "pinched nerve in neck and 2 herniated disc [*sic*] in back." TR 913-914. On August 25, 2001, Dr. Seber ordered an MRI of Plaintiff's "cervical spine" to assess Plaintiff's "[n]eck pain and left arm pain," and "[b]ack pain and bilateral leg pain." TR 919-922; 1146-1148. Dr. Seber's impressions were "[d]egenerative disc disease at C4/5 with prominent uncovertebral osteophyte formation on the left" and "[m]ild degenerative disc disease at C6/7." TR 919.

On August 29, 2001, Dr. Seber treated Plaintiff for "hepatitis C" (TR 911), and ordered laboratory work. TR 917-918.

On August 31, 2001, Dr. Leonardo R. Rodriguez indicated that, because of personal reasons, he would not treat Plaintiff. TR 891. Dr. Rodriguez also noted, however, that he had consulted with Plaintiff about his "low back and neck pain," as well as his "chronic hepatitis C, his psychiatric disorder, and his chronic pain disorder of greater than 25-year history." *Id.*

Dr. Seber consulted with Plaintiff on September 6, 2001 (TR 907-908) concerning his laboratory work (TR 917-918). Dr. Seber also noted that Plaintiff had "neck pain" (TR 908) and "spur C4/5 - compression spinal cord herniated disk - lower back" (TR 909). Dr. Seber referred Plaintiff to a pain clinic called "Woodbury Specialty." TR 908-909.

On September 11, 2001, Dr. Seber consulted with Plaintiff about laboratory work and pain medication. TR 905-906. Dr. Seber noted "no change" in Plaintiff's "musculoskeletal" condition. TR 906.

34

On September 19, 2001, Dr. Benjamin Johnson, Jr. composed a letter to Dr. Seber, stating that he could not accept Dr. Seber's referral of Plaintiff to the Vanderbilt Pain Control Center because of Plaintiff's insurance ("HMO") limitations.[74]  TR 892-894.

On October 17, 2001, Dr. Seber consulted with Plaintiff regarding medication refills, and noted that Plaintiff was "going to pain clinic in 2 weeks."  TR 896.  On November 5, 2001, Dr. Seber had a follow-up consultation with Plaintiff for his "chronic" neck pain, and he prescribed Lortab.[75]  TR 1090-1091.

On November 14, 2001, Mr. Jerell F. Killian and Dr. William R. Sewell performed a psychological evaluation on Plaintiff.  TR 924-927.  Mr. Killian recorded that Plaintiff reported being disabled because of his "back problems, carpal tunnel syndrome, a neck injury, and mental problems."  TR 924.  Mr. Killian noted that Plaintiff "seemed to attempt an honest presentation," and that "he was exposed to severe trauma.  He stated he witnessed so much violence, including several murders in prison."  *Id.*  Mr. Killian also recorded that Plaintiff reported that he was suffering from "depression and anxiety"; that Plaintiff "had experiences of hearing voices"; that Plaintiff was "distrustful and fearful of others"; and that Plaintiff had "considerable physical restriction as a result of his many health problems."  TR 925.  Mr. Killian found that Plaintiff "took advantage of educational opportunities while in prison, and the WAIS-R scores seem to reflect that," but that "[w]orking memory and processing speed, which are easily affected by

---

[74]The record contains documents entitled "referral worksheet" that indicated Dr. Seber's referrals on Plaintiff's behalf.  TR 1092; 1096-1099.  The record also contains a prescription for a "steroid" from Dr. Seber, dated September 25, 2001.  TR 901.

[75]On December 6, 2001, Dr. Seber noted that Plaintiff would not return to the Woodbury pain clinic.  TR 1086.

Case 2:04-cv-00079   Document 20   Filed 02/24/06   Page 35 of 76 PageID #: 35

both physical limitations or problems and distractions caused by emotional problems, are weaknesses." TR 926. Mr. Killian's diagnostic impressions were that Plaintiff had "[d]ysthymia," "[p]sychotic [d]isorder NOS," and "[p]anic [d]isorder with [a]goraphobia." TR 927. Mr. Killian indicated that Plaintiff could make "appropriate decisions regarding the disbursement of funds." *Id.*

On November 28, 2001, Dr. Keown evaluated Plaintiff on behalf of DDS. TR 928-929. Dr. Keown reported that Plaintiff was "seeking [d]isability based on a history of back pain, chronic hepatitis C, carpal tunnel syndrome and neck pain." TR 928. Dr. Keown stated that Plaintiff reported "unremitting lower back pain radiating into both lower extremities along the posterior medical aspects"; that "he had some injections which were not helpful"; and that he was using "hydrocodone for pain." *Id.* Dr. Keown also stated that Plaintiff had "constant pain in the neck, radiating into the left arm with numbness and tingling" and "chronic Hepatitis C," for which he had undergone "interferon" therapy without success. *Id.* Dr. Keown reported that Plaintiff had "carpal tunnel release performed to the left hand 2 years ago," and noted that Plaintiff was "left hand-dominant." *Id.* Upon physical examination, Dr. Keown found that Plaintiff had a "full" range of motion in "both shoulders, elbows, wrists and hands, hips, knees, and ankles"; that he had "back pain during manipulation of the hip and knee joints"; and that "thoracolumbar column anterior flexion is limited by the onset of pain at 60° - Lateral flexion is guarded to the left and right at 15°." TR 929. Dr. Keown assessed Plaintiff as having "neck and back pain," but stated that the "examination does not suggest limitation secondary to disk pathology." *Id.* Dr. Keown found Plaintiff's "hepatomegaly and subjective complaints consistent with chronic active Hepatitis C"; "subjective complaints consistent with carpal tunnel

syndrome"; and "hemorrhoids which are noted to be protuberant." *Id.* Dr. Keown concluded that Plaintiff could "be expected to sit for 6 hours in an 8-hour day"; "walk or stand up to 6 hours in an 8-hour day"; and "routinely lift and episodically lift 20 pounds." *Id.*

On December 7, 2001, Dr. Regan completed a Mental RFC of Plaintiff. TR 930-932. Dr. Regan found that Plaintiff was "moderately limited" in his abilities to "maintain attention and concentration for extended periods"; to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; and to "respond appropriately to changes in the work setting." TR 930-931. Dr. Regan also found that Plaintiff was "markedly limited" in his abilities to "understand and remember detailed instructions"; to "carry out detailed instructions"; and to "interact appropriately with the general public." *Id.* Dr. Regan assessed Plaintiff as: "[u]nable to perform detailed tasks, should be able to adequately perform simple tasks"; "[u]nable to relate to the public, should be able to relate adequately with supervisors and coworkers"; and "[s]hould be able to adapt to simple tasks." TR 932.

On December 11, 2001; December 18, 2001; and January 17, 2002; Dr. DeBerry conducted individual therapy sessions and "med mgt" meetings with Plaintiff. TR 995-1003. Dr. DeBerry indicated that progress "was not made towards goal(s)." *Id.*

On December 20, 2001, Dr. William H. Leone at The Pain Management Group, P.C., treated Plaintiff for "[p]rimarily low back pain but neck pain as well." TR 960-962. Dr. Leone recorded that Plaintiff reported injuring his back while "lifting a very heavy 40 pound box," which "herniated one of his lumbar discs." TR 960. Dr. Leone noted that Plaintiff reported that his pain was "constant" and "very deep." *Id.* Plaintiff characterized the pain on his "best day"

37

as "6/10" and on his "worst day" as "10/10." *Id.* Dr. Leone noted that Plaintiff stated that his

back pain extended to "primarily the right leg," and that his "neck pain" radiated to the left arm.

*Id.* Dr. Leone recorded Plaintiff's "associated symptoms" of insomnia, bowel incontinence,

numbness in his toes and right leg, and "weakness and paresthesias in the bilateral upper and

lower extremities." *Id.* Dr. Leone also recorded Plaintiff's previous medications, including an

"epidural steroid injection in his neck that seemed to help." *Id.* A physical examination revealed

"[d]eep tendon reflexes are decreased in the bilateral lower extremity of the knees. Strength is

decreased in the bilateral lower extremities." TR 961. Dr. Leone observed that Plaintiff had "an

erect posture"; that he "ambulates with slight difficulty and with a limp"; and that he "was able

to perform a heel-toe walk but with some difficulty." TR 961. Dr. Leone's impression was that

Plaintiff had "[c]ervical and lumbar degenerative disc disease"; "[c]ervical and lumbar

radiculopathy"; "[m]uscle spasm in the trapezius, thoracic and lumbar region"; and "[b]ilateral

carpal tunnel syndrome." TR 962. Dr. Leone scheduled a steroid injection, prescribed multiple

medications, and suggested a physical therapy evaluation. *Id.*

On December 27, 2001, Dr. Louise G. Patikas completed a Physical RFC of Plaintiff. TR

947-954. Dr. Patikas opined that Plaintiff could occasionally lift and/or carry 50 pounds,

frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour

workday, sit for about six hours in an eight-hour workday, and push and pull without limitation.

TR 948. Dr. Patikas cited medical evidence for her evaluation, including Plaintiff's x-rays and

MRI scans. *Id.* Dr. Patikas further opined that Plaintiff could frequently climb, balance, stoop,

kneel, crouch, and crawl. TR 949. Dr. Patikas noted that Plaintiff had no manipulative, visual,

communicative, or environmental limitations. TR 950-951. Dr. Patikas also indicated that other

38

"treating/ examining source conclusions" were "significantly different" from her conclusions. TR 953.

On January 17, 2002; January 31, 2002; and February 14, 2002, Dr. Jeffrey York at The Pain Management Group, P.C., administered three "right lumbar transforaminal epidural steroid injection[s]" to Plaintiff and noted that he "tolerated the procedure well." TR 957-959.

On January 30, 2002, Dr. DeBerry evaluated Plaintiff, finding: "[m]ild" "delusional paranoia" and "[m]oderate" depression; "subdued" affect; "narrow" range of affect; "logical" thoughts; "delusions"; and "normal" "memory/orientation."[76] TR 993-994.

On January 30, 2002, Dr. DeBerry evaluated Plaintiff again, finding that he had "[m]ild" "opioid" dependency and "paranoia"; "[m]oderate" anxiety and depression; "normal" affect; and was "mildly impaired" in "memory/orientation."[77] TR 991-992.

On February 1, 2002, Dr. Seber consulted with Plaintiff regarding pain in his hands and elbow, and noted that Plaintiff felt as though his carpal tunnel syndrome was "coming back." TR 1082. Dr. Seber conducted "Motor Nerve Conduction Studies," "Sensory Nerve Conduction Studies," and a "Needle EMG," which revealed "[m]ild bilateral carpal syndromes."[78] TR 1082-1084.

On February 11, 2002, Dr. York prescribed a cane for Plaintiff. TR 1121.

On February 21, 2002, Dr. Seber treated Plaintiff regarding pain in his arms and hands, and noted his complaint that "nothing has helped." TR 1080. Upon physical examination, Dr.

---

[76]The record does not indicate any further treatment. TR 993-994.

[77]The record does not indicate any further treatment. TR 991-992.

[78]The record does not indicate any further treatment. 1082-1084.

39

Seber found that Plaintiff was "quite tender over [the left] lateral epicondyl." TR 1081. Dr. Seber referred Plaintiff to Dr. Lytle. *Id.*

On February 26, 2002, Dr. Francisca V.G. Lytle treated Plaintiff for left elbow pain. TR 1059-1063. Dr. Lytle ordered an x-ray, which revealed "lateral epicondylitis." *Id.* Dr. Lytle administered Lidocaine and Marcaine injections.[79] TR 1059-1063. On March 4, 2002, Dr. Lytle again administered Lidocaine and Marcaine injections, which "again resulted in significant pain relief." TR 1058; 1066.

On March 18, 2002, Dr. Leone treated Plaintiff for back pain. TR 955-956. Dr. Leone noted Plaintiff's "multiple imaging studies" and, upon physical examination, found that Plaintiff walked "with difficulty and with a limp"; had "positive lumbosacral muscle spasms"; and performed "the heel-toe walk with difficulty." TR 955. Dr. Leone's impressions were: "[l]umbar degenerative disc disease"; "[c]ervical degenerative disc disease"; "[l]umbar radiculopathy"; "[c]ervical radiculopathy"; and "[h]epatitis C." *Id.* Dr. Leone indicated that he planned to refill Plaintiff's medications and to "[c]onsider increasing his medications after the discography." TR 956.

On April 2, 2002, Dr. Leone ordered a "three level discogram," which revealed a "grade IV tear of the annulus at L4-L5"; a "grade V tear with degenerative changes at the L5-S1 level"; and "spondylosis of the facets at L4-L5 and L5-S1." TR 1120.

On April 15, 2002, Dr. Leone treated Plaintiff after he went to the "pain clinic in Woodbury." TR 1051. Upon physical examination, Dr. Leone found that Plaintiff manifested a

---

[79]This formed is signed and dated "2/22/02," however, all other dates on this series of forms, including the typewritten date, indicates that the date of the visit was February 26, 2002. *See* TR 1067-1071.

"mild to moderate verbalization of pain behavior throughout the interview," and that his "[c]urrent pain index [was] 8/10." *Id.* Dr. Leone noted that "Robaxin has not seemed to help his muscle spasms," and Dr. Leone changed Plaintiff's prescription to Soma. TR 1051-1052.

On April 24, 2002, Dr. DeBerry found that Plaintiff had a "[m]oderate" "opioid" dependency, "dep-anx," and a "resolved" situation with regard to "alcohol." TR 988-990. Dr. DeBerry assessed Plaintiff as follows: "Axis I: psychotic disorders, dysthymic disorder early onset with atypical features, opioid dependence. Axis II: no diagnosis. Axis III: slipped disc in back and neck; aneurysm of heart; hepatitis C. Axis IV: 24 yrs in prison; chroni [*sic*] hepatitis; chronic pain Severe [*sic*]. Axis V: Current GAF Score: 50."[80] *Id.*

Dr. DeBerry completed a "Treatment Plan Form," which covered Plaintiff's treatment from April 24, 2002 to October 24, 2002.[81] TR 1013-1017. Dr. DeBerry assessed Plaintiff as follows: "Axis I: dysthymic disorder early onset with atypical features, psychotic disorder NOS, opioid dependence. Axis II: antisocial personality disorder. Axis III: slipped disc, aneurysm of heart. Axis IV: spent 25 years in prison (chronic hepatitis) Severe. Axis V: Current GAF Score: 50." TR 1014-1017.

On May 8, 2002, Plaintiff requested a Cortisone shot for his left elbow, and Dr. Seber referred him to Dr. Lytle. TR 1078-1079. On May 13, 2002, Plaintiff requested that Dr. Leone discontinue prescribing "MS Contin"; Dr. Leone prescribed Lortab instead. TR 1049-1050.

On May 20, 2002, Dr. Lytle treated Plaintiff with an injection of Lidocaine and Marcaine

---

[80]There is a duplicate of this evaluation at TR 1019-1024.

[81]The record contains several "[m]edical [h]istory" forms, which detailed Plaintiff's medication. TR 1018; 1035.

Case 2:04-cv-00079   Document 20   Filed 02/24/06   Page 41 of 76 PageID #: 41

and recommended "restricted activities - no lifting, no pushing, etc., as well as gentle stretching exercises for the left elbow and forearm musculature." TR 1057; 1065.

On May 22, 2002, Dr. N. Garrett Powell treated Plaintiff for "low back pain and right lower extremity pain" and recorded that Plaintiff had "undergone multiple conservative therapies including epidural steroid injections." TR 974. Upon physical examination, Dr. Powell noted that Plaintiff had "no percussion tenderness" on his back; a "normal" motor exam"; a "decreased pinprick and light touch in a stocking-like distribution in the distal right lower extremity"; "[d]eep tendon reflexes absent throughout"; and "antalgic gait with diminished weight bearing on the right." *Id.* Dr. Powell discussed his plan to review Plaintiff's prior MRI scan and to "devise other therapeutic modalities to treat his discomfort." *Id.*

On June 11, 2002, Dr. Powell reported that Plaintiff's MRI revealed "spondylosis present at C-4/5 superimposed on a congenitally small canal with infolding of ligamentum flavum posteriorly." TR 973. Dr. Powell noted, "[t]his gives a somewhat 'double pinch' at that level." *Id.* Dr. Powell opined that Plaintiff also had "[s]pondylosis" at "C-6/7"; "mild to moderate degenerative changes" in the "lumbar region"; and "no evidence of impingement of any of the nerve roots on the right side of the lumbar spine." *Id.* Dr. Powell's impression was that Plaintiff was not a "good candidate for neuromodulation," but indicated that Plaintiff "would like to consider neuromodulation."[82] *Id.*

On June 13, 2002, Dr. Leone recorded Plaintiff's statement that Dr. Powell wanted to give Plaintiff a "Morphine narcotic pump this month" and perform a "cervical spine fusion," and

---

[82]Records dated June 5, 2002 to July 30, 2002, indicated that Plaintiff did not attend subsequent appointments with Dr. Powell. TR 972.

42

Dr. Leone added "[p]ositive diskography at L3-4, L4-5, and L5-S1" to Plaintiff's "current pain diagnoses." TR 1047-1048. Dr. Leone changed Plaintiff's prescription from Lortab to MS Contin. TR 1047.

On June 20, 2002, Dr. Lytle treated Plaintiff for "recurrent left elbow pain" and noted "some puffiness at the origin of flexors immediately anterior to the lateral epicondyle." TR 1056; 1064. Dr. Lytle recommended that Plaintiff undergo an MRI if an "epidural steroid injection" did not provide "lasting pain relief," and he noted that Plaintiff had requested an MRI of his hands. TR 1064.

On July 1, 2002, Dr. York performed a "cervical epidural steroid injection" on Plaintiff. TR 1046. Dr. York indicated that Plaintiff "tolerated the procedure well."[83] *Id.*

On July 11, 2002, Dr. Leone treated Plaintiff for his back pain, which was "managed modestly with [Plaintiff's] current medications." TR 1044. Upon physical examination, Dr. Leone noted that Plaintiff manifested "increased verbalization in pain behavior throughout the interview," and that his "[c]urrent pain index rating [was] 10/10." *Id.* Dr. Leone prescribed MS Contin and Soma and added "Neurontin" to Plaintiff's medications, but Dr. Leone instructed Plaintiff to "discontinue" using Neurontin if he noticed side effects. TR 1044-1045.

On July 17, 2002, Dr. DeBerry stated that Plaintiff had "[m]oderate" symptoms of "opioid" and "dep-anx" and a "resolved" level of "acohol [*sic*]." TR 1130-1132. Dr. DeBerry also found that Plaintiff had "[p]sychotherapy [i]ssues" and diagnosed him as follows: "Axis I:

_____

[83]Dr. York performed two other injections, dated July 18, 2002 and August 15, 2002. TR 1043; 1040. Both records include an exact duplicate of the July 1, 2002 treatment notes of the procedure, and of Plaintiff's toleration of the procedure. *Id.* The only difference between the documents is the date. *Id.*

43

psychotic disorder NOS[,] dysthmic disorder early onset with atypical features opioid dependence.  Axis II: no diagnosis on Axis II.  Axis III: slipped disc in back and neck; aneurysm of heart; hepatitis C.  Axis IV: 24 yrs in prison; chroni [*sic*] hepatitis; chronic pain.  Axis V: Current GAF Score = 55."  TR 1131.  Dr. DeBerry stated that Plaintiff exhibited no symptoms of "Tardive Dyskinesia."  TR 1132.  Dr. DeBerry again assessed Plaintiff on October 9, 2002 and January 9, 2003, and his assessments of Plaintiff on those dates remained identical to his July 17, 2002 assessment.  TR 1125-1129.  Additionally, Plaintiff's "level of functioning" was "unchanged."  *Id.*

On February 18, 2003, Dr. Leone treated Plaintiff for lower back pain, "chills," "aches," and "lost meds."  TR 1041.  Upon physical examination, Dr. Leone found that Plaintiff manifested "mild verbalization in the way of pain behavior throughout the interview," and a "[c]urrent pain index [of] 7/10."  *Id.*  Dr. Leone prescribed MS Contin, MSIR, Soma, Celebrex, and "pain medication" for Plaintiff, noting that Plaintiff had not "asked for pain meds" since he started going to the pain clinic.  *Id.*  Dr. Leone also stated that Plaintiff should "discontinue" Neurontin, because of the side effects.  *Id.*

On April 19, 2002, Dr. H.T. Lavely, Jr. completed a Physical RFC of Plaintiff.  TR 963-970.  Dr. Lavely found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and pull without limitation.  TR 964.  Dr. Lavely found that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl.  TR 965.  No manipulative, visual, communicative, or environmental limitations were noted.  TR 966-967.  Dr. Lavely stated that Dr. Keown's evaluation was "credible and is adopted."  TR 969.

44

On September 10, 2002, Dr. Seber treated Plaintiff for "hand pain." TR 1076. Dr. Seber's physical examination of Plaintiff revealed "tingling" in both hands. *Id.* Dr. Seber prescribed "wrist braces for both hands/arms for carpal tunnel." TR 1075.

On September 24, 2002, Dr. Seber examined Plaintiff for complaints of stomach pain which Plaintiff reported felt "like an ulcer he had many years ago." TR 1073. Dr. Seber's "review of systems" noted that Plaintiff had increased "LFT's" and that he had a history of hepatitis C. *Id.* Dr. Seber referred Plaintiff to a "GI." *Id.*

On October 7, 2002, Dr. Kenneth W. Sullivan at The Pain Management Group treated Plaintiff for pain in his "low back radiating down the right leg to the knee," and indicated that "this pain was drastically improved over the past six months due to the epidurals that were done in his lower back and he would like to repeat those as soon as possible."[84] TR 1118. Dr. Sullivan refilled Plaintiff's prescriptions and scheduled him to have a "lumbar transforaminal steroid injection number four" (TR 1119), which Dr. York administered on October 14, 2002 (TR 1117).

On November 5, 2002, Dr. Seber composed a letter stating that Plaintiff was "disabled due to his shoulder and back problems." TR 1145.[85]

On November 5, 2002 and December 4, 2002, Dr. Leone evaluated Plaintiff for a "medication refill and followup visit," noting on both occasions that Plaintiff was "complaining a lot of lower back pain and bilateral upper extremity pain." TR 1112; 1115. Dr. Leone scheduled two "lumbar epidural steroid injection[s]" (TR 1112-1113; 1115-1116), which

---

[84]Dr. Sullivan did not sign the document. TR 1118.

[85]The recipient of this letter is unknown. TR 1145.

45

occurred on November 7, 2002 and December 18, 2002 (TR 1111; 1114).

On December 20, 2002, Dr. Leone treated Plaintiff for back pain and his complaint that his right leg had gone "completely numb."[86] TR 1110.

On January 28, 2003, Dr. York performed Plaintiff's "initial series of right lumbar median nerve branch blocks," and refilled Plaintiff's medications. TR 1109. Dr. York performed the same procedure on February 11, 2003. TR 1107.

On February 5, 2003, Dr. Joseph L. Johnson evaluated Plaintiff on behalf of DDS for complaints of lower back pain: "constant radiating numbness and pain down the right posterior lateral leg to the knee"; "bilateral carpal tunnel syndrome"; "status post left carpal tunnel relief"; "hepatitis C"; "hemorrhoid surgery x 11"; "neck pain"; "perhaps abdominal aorta"; an aneurysm; and depression.[87] TR 1100-1105. Dr. Johnson evaluated Plaintiff for his complaints of lower back pain and upon physical examination, Dr. Johnson found that Plaintiff had "normal" range of motion in his shoulders, elbows, knees, ankles, and hands; and that his "[g]ait was stiff-back posture." TR 1103. Dr. Johnson assessed Plaintiff as having "[c]hronic low back pain"; "[b]ilateral carpal tunnel syndrome"; "[h]emorrhoids which extrude after bowel movements"; "[h]epatitis C"; "[n]eck pain"; and "[d]epression." TR 1104. Dr. Johnson noted Plaintiff's report that he had an aneurysm, but also noted the lack of "official records" about this condition. *Id.* Dr. Johnson made the following "work recommendations" for Plaintiff: "He should be able to sit for more than 6 hours during an 8 hour day. He should be able to stand and walk for 3

---

[86]The remaining treatment notes are illegible. TR 1010.

[87]As used in this paragraph only, "Dr. Johnson" refers to Dr. Joseph L. Johnson. As used elsewhere, "Dr. Johnson" refers to Dr. Benjamin Johnson.

46

hours during an 8 hour day.  He should not routinely lift and could occasionally lift up to 15 pounds.  He should avoid repetitive movements with the hands which might aggravate his carpal tunnel syndrome."  TR 1104-1105.

On March 18, 2003, Dr. Seber completed a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" form regarding Plaintiff.  TR 1133.  Dr. Seber opined that Plaintiff could "lift and/or carry" "less than 10 pounds" (TR 1133), "stand and/or walk" for "10-15 minutes or less" (TR 1134), and sit for "no more than 3 hour[s]" or for "10-20 minutes without shifting weight" (TR 1134).  Dr. Seber asserted that Plaintiff could "never" balance, crouch, kneel, crawl, or stoop.  TR 1134.  Dr. Seber additionally opined that Plaintiff's "physical functions" were affected, including reaching, handling, feeling, and "[p]ushing/pulling."  TR 1135.  Dr. Seber stated that Plaintiff had environmental restrictions, including heights, moving machinery, temperature extremes (cold), "[h]umidity/wetness," and vibration.  TR 1136.  Dr. Seber indicated that Plaintiff's degree of limitation was "normally expected from the type and severity of the diagnoses in this case," that the diagnoses were "confirmed by objective findings," and that he was not basing his opinion "primarily on the patient's subjective complaints."  TR 1137.

Dr. Regan completed a Psychiatric Review Technique Form ("PRTF") regarding Plaintiff.[88]  TR 933-946.  Dr. Regan found that Plaintiff had "[a]ffective disorders" (TR 933) characterized by "dysthymia" (TR 936), as well as "[a]nxiety-related disorders (TR 933) characterized by "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at

---

[88]This record is undated.  TR 933-946.

least once a week" (TR 938).[89]  Dr. Regan opined that Plaintiff had the following "functional

limitations": a "Mild" degree of "Restriction of Activities of Daily Living," and "Difficulties in

Maintaining Social Functioning"; a "Moderate" degree of "Difficulties in Maintaining

Concentration, Persistence, or Pace"; and "One or Two" "Episodes of Decompensation, Each of

Extended Duration."[90]  TR 943.

## B.  Plaintiff's Testimony on March 21, 2003

Plaintiff was born on January 12, 1952, and had a fourth grade education before he

completed his GED.  TR 43.  Plaintiff testified that he could read and write, but that he had

trouble holding a pencil; he also testified that math had been "the lowest on my GED score."  *Id.*

Plaintiff asserted that he last held a job in 1971 and that he had been in prison for 25 years, until

1996.  TR 44.  Plaintiff stated that he could not work because of his health, specifically, because

he had injured his back in prison.  *Id.*  Plaintiff reported that "I bent over and was picking up

some metal rods, and got numb from the waist down."  *Id.*  Plaintiff asserted that he had received

a "steroid injection" which had helped him for "about a year-and-a-half."  TR 44-45.  He stated,

"And then it just, it constantly bothers me since then."  *Id.*  Plaintiff stated that he had had

surgery in 1990, and that he had received "five steroid injections in my back."  TR 45.  Plaintiff

testified that he "constantly" had back pain, that he had "muscle spasms," and that his spine

---

[89]Dr. Regan noted Plaintiff's "Dysthymia" and "Panic D/O" in handwritten notes that are
partially illegible.  TR 945.

[90]The record also contains an "Medical Source Statement of Ability to Do Work-Related
Activities (Mental)" that is incomplete, but stamped with the following message: "It is the policy
of this facility to NOT render narrative opinions or complete questionnaires regarding client
disabilities and/or civil matters."  TR 1036-1037.  The facility responsible for this evaluation is
Plateau Mental Health Center.  TR 4C (The table of contents is paginated 4A-4C).

48

would "get a big knot." *Id.* Plaintiff stated that the pain radiated "into [his] right leg" and "[a]ll the way to [his] foot," and he characterized that pain as a "tingling and numbness feeling." *Id.* Plaintiff testified that this pain occurred "[a]lmost every day." TR 45-46. Plaintiff testified that the doctor had informed him that "it puts pressure on the nerve in, in the lower back." TR 46. Plaintiff clarified his statement by adding, "where the disc will slip." *Id.* Plaintiff asserted that he was "up and down all night," and that he took medication for pain. *Id.* Plaintiff stated that Dr. Griner had prescribed medications for his back, which he injured again in a January 1999 automobile accident. *Id.* Plaintiff testified that, after the accident, he had been taken to the emergency room and referred to Dr. Griner for an MRI of his back. TR 47.

Plaintiff testified that he had carpal tunnel syndrome "in both hands," and affirmed his attorney's assertion that he had undergone a "release," but reported that the procedure had made his condition "worse" and that he "can't hold anything." TR 48. Plaintiff stated that his thumb, index, and middle fingers on his left hand were numb, and that "[i]t is on my right hand too. And I haven't had the surgery on it yet." TR 49. Plaintiff also stated that he had an EMG "done on both hands. And they told me I definitely got to have surgery on both of them." *Id.* Plaintiff testified that he had undergone "carpal tunnel surgery" in 1998, that Dr. Smith had "recommended" the surgery, and that "it was Dr. Thomas that did the surgery." TR 49-50. Plaintiff reported that the surgery "did take the pain away," but that he had "lost all the strength in my hands, or most of the strength," and "if I wash my hands and the water is too hot, they ache, or if I get an ice tray from the refrigerator and it's too cold, they ache." *Id.* Plaintiff stated that he would "wake up at night" because his right hand would be "tingling." TR 51. Plaintiff noted that: "Any kind of activity I do during the day with either hand. It hits me at night." *Id.*

Plaintiff testified that he had had eleven surgeries for his hemorrhoids in two years, that he "was taken to the emergency room last week from severe bleeding," and that he "lost almost a pint of blood." TR 52. Plaintiff asserted that "[a]ny strenuous activity cause [*sic*] me to bleed," and that he had "[s]evere pain." *Id.* Plaintiff also testified that he could not "have the surgery done because I live here in Cookeville, and I can't ride an automobile back up here." TR 52-53. He added, "They're scared I'll hemorrhage to death." *Id.* Plaintiff stated that "they had to do a massive hemorrhoidectomy." TR 53. When the ALJ asked Plaintiff why he did not have the surgery on an "inpatient" basis, Plaintiff answered that his "insurance won't cover an inpatient." TR 53. Plaintiff stated that a Nashville doctor had consulted with him regarding his hemorrhoids, and had told him that he would "have to have a surgery every two years for the rest of my life." TR 55. This physician also told Plaintiff that "I was literally butchered by the doctors in prison." *Id.* Plaintiff stated that he had "refused to let the Tennessee prison operate [*sic*] me," and then stated "[a]nd then I was released. And I've had so much trouble with hepatitis that they wouldn't operate on me because of my body weight and my blood." TR 56. Plaintiff testified that he had been incarcerated for "two armed robberies and two gun charges," and that he had been moved to fifteen prisons because, "I was an escape risk. I escaped three times." TR 57.

Plaintiff testified that he had not sought treatment for his anxiety and depression problems while in prison, but that he had undergone psychiatric treatment since his release. TR 57-58. Plaintiff recounted an anxiety attack that had occurred when he visited Wal Mart, stating "[i]t felt like something was pressing on my chest. I was smothering. And I got real sweaty and real nervous." TR 58. Plaintiff asserted that he could not tolerate "a large crowd of people," and

50

that he would "get to shaking real bad" and have "crying spells." *Id.* Plaintiff stated that medication had helped reduce his crying spells from "once or twice a week sometimes" to "once in a while." TR 59. Plaintiff asserted that he heard voices, and that "Dr. Dubarry [*sic*] is treating me for that." *Id.* Plaintiff testified that he had initially been unwilling to tell Dr. DeBarry about the voices, stating that he was "scared he'd report it to my parole officer." *Id.* Plaintiff stated that medication was helping to control this problem. *Id.*

Plaintiff testified that he had been diagnosed with hepatitis C, that he contracted it while "in prison from tattooing," and that he had been "on the interferon for approximately seven months, and it didn't work." TR 53. Plaintiff further stated that he had been seeing a specialist at Vanderbilt, and that he would be put "on a liver donors list" if his hepatitis C did not go into remission. *Id.* Plaintiff reported that his hepatitis C made him "weak all the time." TR 54. He stated, "I've lost, all total, I lost 47 pounds," and that he experienced nausea and "severe dizziness"; he stated that he would rest "sometimes, five, six, seven, eight times a day" for short periods of time. *Id.* Plaintiff stated that he could sit "usually 15, 20 minutes" and that he "can't walk no long distance." TR 55.

Plaintiff stated that he had an "aneurysm on the bottom of my heart," which was discovered during a "CAT scan" of his liver. TR 60-61. Plaintiff testified that he had not received have treatment for his aneurysm. TR 62.

### C. Vocational Testimony on March 21, 2003

Vocational Expert ("VE"), Patsy Bramlett, also testified at Plaintiff's hearing. TR 62. The ALJ stated that there was "no relevant past work to characterize." TR 62. The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff, specifically adopting

51

the limitations from an RFC completed on May 21, 1998 by Dr. Orrin Jones.[91]  TR 62-63.  The

VE answered that such a hypothetical claimant could perform a "limited range of light work."

TR 63.  The VE opined that in the State of Tennessee, there were approximately 2,400 inspector

positions, 1,500 conveyor line attendant positions, and 2,000 automatic machine tender

positions, all of which would be appropriate for the hypothetical claimant.  *Id.*

     The ALJ modified the hypothetical to reflect the "psychological limitations" from a

Mental RFC completed by Dr. Victor Pestrak on April 8, 1998.[92]  TR 63-64.  The VE testified

that these limitations "would not change the job availability."  TR 64.  The VE further testified

that sedentary jobs would also be 1,100 parts inspector positions, 700 parts sorter positions, and

1,200 automatic machine tender positions.  *Id.*

     The ALJ again modified the hypothetical, positing a "GAF" of 55, and asking the VE to

consider whether that GAF would "permit the performance of the light and sedentary jobs."  TR

64.  The VE answered that a hypothetical claimant with a GAF of 55 could perform such jobs.

*Id.*  The ALJ similarly asked whether a GAF of 50 would affect "performance of unskilled jobs

such as those you've identified at light and sedentary."  TR 65.  The VE answered that a

hypothetical claimant with a GAF of 50 could not perform such jobs.  *Id.*

     The ALJ next modified the hypothetical, to reflect a hypothetical claimant with the

"ability to occasionally lift and carry 30 pounds, frequently lift and carry 10" and who could

"stand and walk six hours in an eight hour day, and sit six hours in an eight hour day."  TR 65.

The ALJ asked the VE if these limitations were "consistent with the performance of the light

---

[91]Dr. Jones' Physical RFC is located in the record at TR 188-195.

[92]Dr. Pestrak's Mental RFC is located in the record at TR 175-187.

jobs that you previously identified," and the VE responded in the affirmative.  *Id.*  The VE also agreed with the ALJ's characterization of these limitations as "pretty much a full range of light work."  *Id.*

The ALJ asked the VE to consider the "testimony that was offered today, with respect to the exertional and mental limitations."  TR 65.  The VE responded that giving full credit to the testimony would eliminate the availability of any of the aforementioned positions.  *Id.*

Plaintiff's attorney asked the VE to describe the availability of the positions "in the upper Cumberland area."  TR 66.  The VE responded that she did not know.  *Id.*  The ALJ asked Plaintiff's attorney to define the Cumberland area, and Plaintiff's attorney redefined the area as the "middle third" of Tennessee.  *Id.*  The VE again responded that she did not know the availability of the positions in that area.  TR 67.  The ALJ asked whether hepatitis C was a "disqualifier" for working in the food industry, and the VE responded in the affirmative.  TR 69-70.  The ALJ asserted that "[n]one of these jobs that you've identified at light or sedentary specifically have to do with food handling or preparation," and the VE concurred.  TR 70.

The ALJ next inquired whether a "sit, sit/stand option or the postural limitations described[,] [and] the manipulative limitations," such as "reaching and pushing and pulling, [would] have any impact on the numbers of sedentary jobs."  TR 72.  The VE responded that this limitation would not affect the availability of the identical sedentary jobs.  *Id.*

The ALJ then queried about the affects on the availability of the stated positions, "[i]f standing and walking was limited to walking 100 meters out of an eight hour day, sitting was limited to 20 minutes."  TR 72.  The VE responded that this modification would eliminate full-time work and sedentary work.  *Id.*

53

### D.  Plaintiff's Testimony on April 3, 2003

Plaintiff was born on January 12, 1952, and reported that he had obtained his GED while he had been in prison from age 19 to age 45.  TR 1159; 1182.  Plaintiff testified that had he tried to work since he had been released from prison, but that he "wasn't able to."  TR 1159.  Plaintiff stated that he contracted hepatitis C "[t]hrough tattooing" in prison.  *Id.*  Plaintiff testified that he had been on interferon treatment for six months, but that "[i]t did no good."  TR 1160.  Plaintiff stated that his doctors had informed him that they would not prescribe additional medications to help with the side effects of interferon because the additional medications had "very severe side effects with depression."  *Id.*  Plaintiff described how his hepatitis C caused him to be "very weak," to remain "up and down all night long," to lose "about 40 pounds," and to experience "[d]izziness, nausea, loss of appetite," and "diarrhea."  TR 1160-1161.

Plaintiff testified that his hemorrhoids caused "[c]onstant bleeding, constant pain."  TR 1162.  Plaintiff recalled that had undergone 11 surgeries for his hemorrhoids while he was in prison.  TR 1161.  Plaintiff stated that a doctor had told him that he would have to have surgeries "every 18 months to two years," and that "I'll have to have it for the rest of my life because they butchered me so bad in prison."  TR 1163.  Plaintiff clarified that a specialist had informed him that the treatment that he had received for his back pain while in prison had caused his hemorrhoids.  TR 1176.  Plaintiff explained that "they didn't give me no fluids or anything like that, no IV's.  I don't know.  They just kept me on Thorazine, unconscious, and when I had a bowel movement it was like passing a rock, mister.  And that's what caused it.  And ever since then I've had problems passing blood and chronic pain."  *Id.*  Plaintiff testified that he was unwilling to undergo more surgery for his hemorrhoids, and expressed that he was worried that

54

he would "bleed to death sitting up in the vehicle riding back." TR 1161. The ALJ asked Plaintiff whether he had undergone surgery for his hemorrhoids, a surgery that Plaintiff had stated was forthcoming at his prior hearing. TR 1171. Plaintiff answered that "Dr. Rayna [*sic*]," who was going to perform the procedure, "stopped taking my medical card." *Id.* Plaintiff stated that he had been unable to find a physician in Cookeville to operate on his hemorrhoids because "they won't accept my medical card," and because "it's so severe." TR 1163.

Plaintiff testified that he had injured his back in 1975 while in prison and that "[i]t started getting worse in about 1980 and over the years I've had the injections ... I'm guessing between 15 and 18 series of injections in my back." TR 1163. Plaintiff testified that, "the discs are so deteriorated that they can't fuse them together." *Id.* Plaintiff stated that his pain was "so severe at times I'm in [*sic*] the floor." TR 1163-1164. He testified, "I can't even get up. That's why I'm assigned this cane so I can -- when my back goes out I can get up off the floor with this cane." *Id.* Plaintiff also stated that he had a "back brace," and that he wore a "foot brace" to "keep my ankle from twisting." TR 1164. Plaintiff stated that he avoided "lifting" (TR 1168-1169), and that he rested during the day, especially after using the bathroom and sometimes because of his back and stress (TR 1169). Plaintiff stated that he had to change positions often, and that it hurt to walk. TR 1169-1170. Plaintiff stated that "Dr. Lion [*sic*]" treated him at the "pain clinic" once a month, and that he had to "stop on the way and on the way back" because of pain. TR 1171-1172. Plaintiff reported having neck pain, including "two herniated discs in my neck," for which he went to the "pain clinic" and "had epidurals too." TR 1164. Plaintiff stated that he had gone to Summit Medical Center, and that Dr. Powell "wanted to put the morphine pump in my stomach." TR 1172-1173. He said that Dr. Powell was "the one that told me he

55

couldn't do the back surgery and [*sic*] because my discs are so deteriorated that it would be like a domino effect." TR 1172-1173. Plaintiff stated that he had an upcoming appointment to "destroy one of the nerves that's pinched" and to "relieve the pain." TR 1165.

Plaintiff testified that he had received three injections in his elbow, and that he had "damaged the nerves in it too in my left elbow and I'm left-handed." TR 1175-1176. He said, "And the nerve that's pinched in my neck is on the left side." *Id.* Plaintiff also testified that he had carpal tunnel syndrome in both hands. TR 1165. Plaintiff stated that he had undergone a carpal tunnel release procedure, that he "lost a lot of strength out of my left hand," and that he had a brace for both his left and right hands, but that he could not use the brace for his left hand while using his cane. TR 1166. Plaintiff asserted that his hands caused him to have pain "constantly," and that "[h]ot and cold" caused his hands to "ache real bad." *Id.*

Plaintiff also reported that he had emotional problems, including depression, for which he sought treatment from "Plateau Mental Health." TR 1167. Plaintiff testified that his depression involved crying spells, and that his depression was "about the same." TR 1167-1168. Plaintiff also stated that he "just can't stand to be around large crowds of people" and that he suffered from anxiety attacks. TR 1168. He explained that, "It feels like I'm smothering inside. I get a tightness in my chest and it feels like I'm going -- I'm smothering and I black out." *Id.* Plaintiff testified that he heard voices, but that his medication had helped reduce the frequency with which he heard those voices. *Id.* Plaintiff stated that "[i]t used to be constantly," but with the medication, had been reduced to "two or three times a week." *Id.*

Plaintiff stated that he had an abdominal aorta aneurysm, and asserted that he had been told "not to lift over five pounds because it could rupture and kill me." TR 1167.

56

Plaintiff stated that he was moving, and that "[m]y uncles, my step-father, my brothers and friends of ours has helped us fix this place up." TR 1174. Plaintiff testified that "Dr. Seaver [*sic*]" was his "primary care" physician. TR 1165.

### E. Testimony of Plaintiff's Wife on April 3, 2003

Plaintiff's wife, Velma Arendell, testified that she had met Plaintiff "a month after he got out of prison so I've seen him deteriorate all this time I've known him." TR 1175. Ms. Arendell testified that Plaintiff got hemorrhoids because "he got injured on his back and then they put Thorazine in him and kept him unconscious. That's how he got the hemorrhoids in prison. They didn't give him any fluids to his body and that's how he got the hemorrhoids." *Id.*

### F. Vocational Expert's Testimony on April 3, 2003

Vocational Expert ("VE"), Dr. James D. Flynn, also testified at Plaintiff's hearing. TR 1180. The ALJ stated that Plaintiff had "no work activity or past relevant work," and that he was 51 years of age at the time of the hearing. TR 1181-1182. The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff, that included the limitations from "Dr. Sever's [*sic*]" March 18, 2003 "Medical Assessment of Ability to Do Work-Related Activities (Physical)."[93] TR 1182-1183. The VE answered that such a hypothetical claimant could not perform any work. TR 1183.

The ALJ modified the hypothetical to include the mental limitations from a CRG form at "Exhibit 37-F."[94] TR 1184. The VE responded that such a hypothetical claimant would be able to work. *Id.* The ALJ stated that someone who had a "GAF" of 50 would not be able to "meet

---

[93]Dr. Seber's assessment is contained in the record at TR 1133-1137.

[94]"Exhibit 37F" contains a CRG form at TR 1122-1124.

Case 2:04-cv-00079   Document 20   Filed 02/24/06   Page 57 of 76 PageID #: 57

the mental demands of unskilled work," and the VE concurred.  *Id.*  The ALJ then proposed that

a hypothetical claimant with a "GAF" of 55 would be able to perform "most unskilled work,"

and the VE again concurred.  *Id.*

The ALJ further modified the hypothetical to incorporate a "[c]onsultative examination

by Dr. Johnson," from February 5, 2003.[95]  TR 1184-1185.  The VE responded that such a

hypothetical would "eliminate work."  TR 1185.

The ALJ next described "an individual capable of light work, with occasional postural

activities, no other limitation of function [...], who is also limited by moderate psychological

limitations on concentrating, persisting, social interaction, and adaptation," and who had a

"marginal only [*sic*] education."  TR 1185.  The VE responded that positions that involved

"routine work, such as graders, inserters, non-agricultural" would be available for such an

individual.  TR 1185-1186.

The VE opined that in the State of Tennessee, there were 451 grader positions requiring

"[l]ight work only, marginal education"; 736 production inspector, checker, and examiner

positions; and 3,755 assembly positions requiring "again light, marginal education," all of which

would be appropriate for the hypothetical claimant.  TR 1186.  In addition, the VE testified that

there were other positions which would be appropriate for the hypothetical claimant, but the ALJ

stated that the VE need not list them.  *Id.*

The ALJ modified the hypothetical, suggesting an RFC for "medium work with frequent

postural activities, no other limitation," and "moderate, psychological limitations."  TR 1186.

The VE stated that "the same three categories" of positions were available, including 37 grader

---

[95]Dr. Johnson's consultative examination is contained in the record at TR 1100-1105.

and inserter positions, 103 inspector positions, and 969 assembler positions.  *Id.*  The VE stated that there were additional jobs available, including 1,652 farm worker positions, and 14,614 janitor and cleaner positions.  TR 1187.

The ALJ asked the VE to incorporate the mental limitations from Plaintiff's RFC, completed by Dr. Regan and dated December 7, 2001.[96]  TR 1187.  The VE responded that these mental limitations would not affect the availability of "light" or "medium" work.  *Id.*  Next, the ALJ asked the VE to incorporate the limitations from Dr. Keown's consultative examination, dated November 28, 2001.[97]  TR 1187-1188.  The VE responded that the "light" work would remain available.  TR 1188.

The ALJ then asked the VE to incorporate the limitations from a physical consultative examination from Dr. E. Dewey Thomas, dated September 23, 1996.[98]  TR 1189.  The VE responded that such a hypothetical claimant could perform "light" work as described above.  *Id.*

The ALJ next asked the VE to assume the limitations from a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" from Dr. Rana, dated February 8, 1999.[99]  TR 1188.  The VE responded that such limitations would "eliminate work."  TR 1191.  The ALJ also asked the VE to consider the effect of hepatitis C on the availability of work, and the VE responded that it would not "materially affect those that he could have performed for other physical and mental reasons, because it's not dealing with food."  TR 1192.

---

[96]Dr. Regan's Mental RFC is found in the record at TR 930-932.

[97]Dr. Keown's consultative examination is found in the record at TR 928-929.

[98]Dr. Thomas' consultative examination is found in the record at TR 598-599.

[99]Dr. Rana's assessment is found in the record at TR 684-688.

59

Plaintiff's attorney asked the VE to consider how Plaintiff's "daily problems with hemorrhoids, causing him to have to lie down after elimination" would affect the availability of "light and medium jobs." TR 1194. The VE responded that this limitation would preclude any work. *Id.* The attorney asked if "bilateral carpal tunnel syndrome" and wearing "braces" that do not allow use of the hands would affect available jobs. *Id.* The VE responded that these conditions and limitations would "probably eliminate work." *Id.* The attorney asked how resting during work hours would affect the availability of jobs, assuming that the resting could not occur for a short period or during the noon hour, and the VE responded that such limitations would "eliminate work." TR 1195.

The ALJ asked the VE to consider how "limitations on repetitiveness of constant gripping and wrist movement" would limit the availability of positions as "graders, and sorters, inspectors, and assemblers at light." TR 1195. The VE responded that these limitations would "interfere," and that he would "refer" such a person to "sorting, not to the assembly." *Id.* The VE further clarified that only 25% of the assembly positions would remain available because "gripping would be problematic if there was sufficient weight involved." *Id.* The ALJ asked whether any "medium" exertion jobs would remain available, and the VE responded that only the positions as a janitor would still be available with such limitations. TR 1196.

### III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to

60

support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

61

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[100] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition

---

[100]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

62

that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

63

## C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred by 1) assessing Plaintiff's RFC, 2) failing to consider the combined effects of Plaintiff's impairments, 3) applying the grid regulations to reach a decision, 4) rejecting the opinions of treating physicians, 5) failing to properly evaluate Plaintiff's subjective complaints of pain, 6) failing to give full credit to Plaintiff's testimony,[101] and 7) finding that a significant number of jobs existed in the regional economy that Plaintiff could perform.  Docket Entry No. 12.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6ᵗʰ Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Secretary*, 17 F.3d 171, 176 (6ᵗʰ Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

---

[101]Plaintiff's fifth and sixth statements of error are essentially identical, and for this reason the Court has addressed them together.

64

**1.  Residual Functional Capacity**

Plaintiff argues that the ALJ erred in finding that Plaintiff had an RFC to perform a significant range of light work.  Docket Entry No. 12.  Specifically, Plaintiff argues that the ALJ's determination of Plaintiff's RFC was not supported by substantial evidence.  *Id.*

As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," *Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229).

The record here is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence."  The ALJ considered and discussed numerous medical opinions and objective medical evidence (TR 731-739), as well as DDS evaluations (TR 732, 736-739) concerning Plaintiff's impairments and his ability to work.  Additionally, the ALJ's decision demonstrates that he carefully considered the testimony of both Plaintiff and the VE.  TR 731-739.  While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's determination that Plaintiff had an RFC to perform a "restricted range of light work."  TR 732; 738-739.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387.  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the

65

conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

## 2. Evaluation of the Combined Effect of All Impairments

Plaintiff contends that the ALJ failed to properly evaluate the combined effect of his impairments. Docket Entry No. 12. Plaintiff does not specifically argue that the ALJ failed to give proper weight to a particular impairment, but simply argues that the ALJ did not properly evaluate the combined effect of all of his impairments, including hepatitis C, hemorrhoids, carpal tunnel syndrome, back problems, aneurysm, and mental/emotional problems. *Id.*

Plaintiff correctly asserts that the ALJ must evaluate the combined effect of his impairments. 42 U.S.C. § 423(d)(2)(B). Plaintiff, however, fails to show that the ALJ did not do so. Instead, Plaintiff simply maintains that the ALJ improperly picked certain impairments over others. Docket Entry No. 12.

The ALJ, after evaluating all of the medical, vocational, and testimonial evidence, determined that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing. TR 739. In making this determination, the ALJ specifically noted, *inter alia*, that Plaintiff made "no complaints regarding hemorrhoids in the progress notes from March 2001 through March 2003" (TR 732) and he noted "mild to moderate degenerative changes" from an August 2001 MRI of Plaintiff's spine (TR 734). The ALJ also noted that Plaintiff asserted that he could not lift more than five pounds because of an aneurysm, but that Dr. Johnson found that such a restriction would be inappropriate, even if Plaintiff had such an aneurysm. TR 737. The ALJ discussed Plaintiff's numerous assessments at the Plateau Mental Health Center (TR 737), his weight loss from hepatitis C (TR 732-733), and his surgery to relieve the carpal tunnel

66

syndrome in his left hand (TR 733). The rationale in the ALJ's decision specifically addresses the medical evidence, as well as Plaintiff's testimony and subjective claims of his several impairments, clearly indicating that these impairments were considered. TR 731-739. There is no evidence to support Plaintiff's claims that the ALJ did not consider all of Plaintiff's alleged impairments. To the contrary, it is clear from the ALJ's articulated rationale that the ALJ considered the record as a whole in evaluating the combined effect of Plaintiff's impairments.

There is substantial evidence in the record to support the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing; the ALJ's decision, therefore, must stand.

### 3. Reliance on the Grid Rules

Plaintiff argues that the ALJ's reliance on the grid at step five of the sequential evaluation process is erroneous because Plaintiff has psychiatric limitations. Docket Entry No. 12. Although Plaintiff correctly asserts that the grid rules are inapplicable in the presence of nonexertional limitations, Plaintiff fails to show that Plaintiff's psychiatric condition, along with consideration of the VE's testimony, precludes application of the grid rules.

As explained above, the Commissioner has the burden at step five of establishing the claimant's ability to work by proving the existence of a significant number of jobs in the national economy that the claimant could perform, given his or her age, experience, education, and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920. *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). The Commissioner's burden at step five can be satisfied by relying on the grid rules only if Plaintiff is not significantly limited by nonexertional impairments, such as mental limitations, manipulative limitations or environmental limitations.

Case 2:04-cv-00079   Document 20   Filed 02/24/06   Page 67 of 76 PageID #: 67

*Abbot v. Sullivan*, 905 F.2d 918, 926 (6ᵗʰ Cir. 1990).

Plaintiff contends that medical evidence of his "psychotic disorder" demonstrate that he suffers from nonexertional impairments, specifically mental limitations, and that, accordingly, the ALJ's reliance on the grid rules was improper. Docket Entry No. 12. The mere presence of a mental impairment, however, does not preclude reliance upon the grid rules unless the mental impairment results in functional limitations that significantly limit the Plaintiff's ability to work at a particular exertional level. *See, e.g., Moon*, 923 F.2d at 1182; *Buress v. Secretary*, 835 F.2d 139, 142-43 (6ᵗʰ Cir. 1987).

In his decision, the ALJ discussed that Plaintiff suffered from mental limitations or other nonexertional impairments that affected his ability to perform work at a particular exertional level. TR 731-740. The ALJ explicitly stated that Plaintiff's "non-exertional limitations do not allow him to perform the full range of light work." TR 740. The ALJ, however, did not rely solely upon the grid rules, because he also explicitly stated that he made his decision using the VE's testimony as well as the grid rules. *Id.* The full quotation states:

> Although the claimant's non-exertional limitations do not allow him to perform the full range of light work, using the above-cited rules as a framework for decision-making and based on the vocational expert's testimony, there are a significant number of jobs in the economy which he could perform.

*Id.*

Further, the ALJ discussed not only Plaintiff's mental conditions and treatment at Plateau Mental Health Center (TR 737), but also the VE's testimony (TR 739-740). The ALJ properly evaluated the evidence at step five to establish Plaintiff's ability to work. The ALJ's decision, therefore, must stand.

68

**4.  Weight Accorded to Opinion of Plaintiff's Treating Physician**

 Plaintiff maintains that the ALJ erred in failing to give controlling weight to the opinions of Dr. Rana and Dr. Seber.  Docket Entry No. 12.  Specifically, Plaintiff argues that the ALJ should have given greater weight to particular elements of their opinions in regard to Plaintiff's hepatitis C, hemorrhoids, carpal tunnel syndrome, back problems, aneurysm, and mental/emotional problems.  *Id.*

 With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
>  (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
>  (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
>
>  (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.

69

The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

...

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

[Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

Dr. Seber and Dr. Rana both treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to their opinions than to other opinions. As has been noted, however, Dr. Seber's and Dr. Rana's opinions contradict other substantial evidence in the record. The ALJ specifically stated that he did not give full credit to Dr. Seber's assessment from March 2003 (TR 734), nor did he give full credit to Dr. Rana's assessment (TR 738). The ALJ decided to give credit to other medical evidence that was inconsistent with these opinions, including x-rays and MRIs (TR 733-734); treatment records from other physicians such as Dr. Leone (TR 734-736); and assessments from other physicians such as Dr. Keown and Dr. Johnson (TR 732, 736-737). As the Regulations state, the ALJ is not required to give

70

controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* As such, the Regulations do not mandate that the ALJ accord Dr. Seber's or Dr. Rana's evaluation controlling weight. Accordingly, Plaintiff's argument fails.

## 5. Subjective Complaints of Pain and Credibility

Plaintiff contends that in finding that his subjective complaints were not fully credible, the ALJ did not appropriately address his complaints of pain. Docket Entry No. 12.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a

Case 2:04-cv-00079   Document 20   Filed 02/24/06   Page 71 of 76 PageID #: 71

debilitating degree that it prevents an individual from engaging in substantial gainful activity."

*Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)).  After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJ found that he did not fully accredit Plaintiff's testimony about his subjective complaints of pain, nor did he find Plaintiff credible.  TR 739.  Specifically, the ALJ articulated that "the record is replete with inconsistencies in the claimant's reports of previous treatment and surgeries." *Id.*  The ALJ discussed aforementioned factors, including Plaintiff's assertion that he has to "lie on his side for 30 to 180 minutes after each bowel movement because of pain and bleeding" (TR 732), his statement that his low back pain was exacerbated by most activities, especially bending and lifting (TR 734), his fatigue and weight loss following interferon therapy for hepatitis C (TR 732), his report that "several epidural steroid injections had really helped his back pain" (TR 733), and his use of a back brace and

72

cane (TR 734).  As can be seen, the ALJ's decision specifically addresses in great detail not only

the medical evidence, but also Plaintiff's testimony and his subjective claims, clearly indicating

that these factors were considered.  TR 731-339.  The ALJ's decision properly discusses

Plaintiff's "activities; the location, duration, frequency and intensity of claimant's pain; the

precipitating and aggravating factors; the type, dosage and effect of medication; and the other

treatment or measures to relieve pain."  *Felisky*, 35 F.3d at 1039 (*construing* 20 C.F.R. §

404.1529(c)(2)).  It is clear from the ALJ's detailed articulated rationale that, although there is

evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that

were inconsistent with Plaintiff's allegations.  This is within the ALJ's province.

      The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective

medical evidence against Plaintiff's subjective claims of pain and reach a credibility

determination.  *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th

Cir. 1981).  An ALJ's findings regarding a claimant's credibility are to be accorded great weight

and deference, particularly because the ALJ is charged with the duty of observing the claimant's

demeanor and credibility.  *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461,

463 (6th Cir. 1987)).  Discounting credibility is appropriate when the ALJ finds contradictions

among the medical reports, the claimant's testimony, the claimant's daily activities, and other

evidence.  *See Walters,* 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*,

742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir.

1987)).  If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly

state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the

reasons must be supported by the record (*see King*, 742 F.2d at 975).

73

After assessing all the objective medical evidence, the ALJ determined that Plaintiff's testimony was not credible. TR 739. The ALJ cited, among other things, Plaintiff's testimony about attempting suicide by swallowing razor blades, and the lack of documentation in the record. TR 732, 737, 739. As has been noted, this determination is within the ALJ's province.

The ALJ observed Plaintiff during his hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

## 6. Existence of Significant Numbers of Jobs

Plaintiff contends that the ALJ erred in finding that a significant number of jobs existed in the regional economy that Plaintiff could perform. Docket Entry No. 12. Specifically, Plaintiff asserts that the VE's testimony did not indicate a significant number of jobs because Plaintiff would have to travel a substantial distance to have access to these jobs. *Id.*

Whether a significant number of jobs exists is based on many factors, and all relevant factors should be considered by the court. *See Hall v. Bowen,* 837 F.2d 272, 274-275 (6th Cir. 1988). *Hall* enumerated six factors: 1) the level of the claimant's disability; 2) the reliability of the vocational expert's testimony; 3) the reliability of the claimant's testimony; 4) the distance the claimant is capable of traveling; 5) the isolated nature of the jobs; and 6) the types and availability of such work. *Hall*, 837 F.2d at 274-275. In *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999), the court clarified its holdings in *Hall*, *supra*, and held that the six factors identified in *Hall* were "suggestions only -- the ALJ need not explicitly consider each factor."

As has been noted, the ALJ is not required to explicitly consider the six factors

Case 2:04-cv-00079   Document 20   Filed 02/24/06   Page 74 of 76 PageID #: 74

enumerated in *Hall*; however, in the case at bar, the ALJ considered at least four of the enumerated factors. In his opinion, the ALJ cited and discussed numerous medical records to reach a conclusion about Plaintiff's RFC (TR 732; 738-739), accredited the VE's testimony (TR 739), explained that he did not fully accredit Plaintiff's alleged level of impairment (TR 732; 738-739), and outlined the types of positions appropriate for Plaintiff (TR 739). In addition to these factors, the ALJ's decision detailed Plaintiff's medication and treatment, including his refusal of treatment. TR 733-736, 739. In his decision, the ALJ considered many relevant factors, including the types of factors enumerated in *Hall*, to determine whether a significant number of jobs existed that were appropriate for Plaintiff. Accordingly, Plaintiff's argument fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment Based Upon the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

Case 2:04-cv-00079   Document 20   Filed 02/24/06   Page 75 of 76 PageID #: 75

E. CLIFTON KNOWLES
United States Magistrate Judge

76